## CHARLESTON.

### STATE *v.* ELIJAH HARDIN

Submitted May 2, 1922.        Decided May 9, 1922.

1. HOMICIDE—*Where Self-Defense is Relied on, Defendant May Prove Bad Reputation of Decedent, Prior Attacks by Decedent, Threats, and Specific Acts of Violence.*

   In a prosecution for murder, where self defense is relied upon to excuse the homicide, and there is evidence showing, or tending to show, that the deceased was at the time of the killing making a murderous attack upon the defendant, it is competent for the defendant to prove the character or reputation of the deceased as a dangerous and quarrelsome man, and also to prove prior attacks made by the deceased upon him, as well, as threats made to other parties against him; and if the defendant has knowledge of specific acts of violence by the deceased against other parties, he should be allowed to give evidence thereof. (p. 152).

2. SAME—*Defendant Must Establish Self-Defense by Preponderance of Evidence.*

   In a prosecution for homicide, where self defense is relied upon as an excuse, the burden is upon the defendant to establish such defense by a preponderance of the evidence, and in determining whether or not such defense has been so

established the jury should consider any evidence introduced, either by the state, or the defense, bearing upon that issue. (p. 154).

3. SAME—*Instruction that Inference of Malice Should Not be Drawn From Defendants' Being Armed Proper Where There Was Evidence of Prior Threats Against Him.*

One who has been attacked, or is threatened with a murderous attack which he has reason to believe will be made, may arm himself for defense, and in such case no inference of malice can be drawn therefrom; and in a prosecution for homicide where self defense is relied upon, and there is evidence showing, or tending to show, that the defendant had been attacked by the deceased just prior to the homicide, and that threats of violence had also been made against him just prior thereto, an instruction telling the jury that no inferference of malice should be drawn from the fact that the deceased was armed upon the occasion of the homicide, in case they find he had reasonable ground to believe that a murderous attack would likely be made upon him, should be given. (p. 155).

Error to Circuit Court, McDowell County.

Elijah Hardin was convicted of murder in the first degree and sentenced to the penitentiary for life, and he brings error.

*Reversed and remanded.*

*Litz & Harman,* for plaintiff in error.

*E. T. England,* Attorney General and *R. Dennis Steed,* Assistant Attorney General, for the State.

RITZ, JUDGE:

Defendant was convicted in the Criminal Court of McDowell County of murder in the first degree, and sentenced to the penitentiary for life. The circuit court of said county refused to review this judgment, and this writ of error is prosecuted to this court for that purpose.

The defendant and the deceased, Dave Shoun, were first cousins, and had been living with their families in houses upon adjoining lots at Empire, in McDowell county, for about two years immediately preceding the shooting. The yard around each of the houses was enclosed, and the houses in which the parties lived separated by a fence constructed

about half way between the two, or about 15 feet from each house.     The deceased was a man about 40 years of age, and weighed about 185 to 190 pounds, and was physically strong and well developed.     The defendant is a much younger man about 27 years of age, and weighed about 117 pounds. The evidence of the defendant's wife showed that prior to the shooting deceased had made improper proposals and advances to her, which she had communicated to the defendant.     The evidence of other witnesses showed that very shortly before the fatal occurrence the deceased had made threats of violence against the defendant, and had on at least two occasions drawn a pistol on him, and compelled him to humiliate himself while under this duress. It seems that on the day of the shooting the defendant had determined to resign his position with the Empire Coal & Coke Company and move away.     He had turned in his time book and the superintendent of the company had given him a letter recommending him to any other employer needing his services.     He then went to his home and, according to the evidence of the deceased's son, Fred Shoun, called to the deceased.     According to this witness the deceased was not at home at the time, and he so informed the defendant. When the deceased did come from his work his son testifies that he informed him that the defendant wanted to see him, and that he thereupon went to the fence separating the two houses, and called the defendant, who likewise came up to the fence; that when the parties thus confronted each other, the defendant said to the deceased, ''You have been telling lies on me;'' that the deceased denied this statement, but averred that the defendant and his wife had been telling lies on him, and that he could prove it, and that thereupon the defendant pulled his pistol and fired one shot, which grazed the head of the deceased, who immediately turned as if to retreat, when another shot was fired which entered his body on the right side, and still another in quick succession, which penetrated the body, and still a fourth shot which it appears missed the deceased, and which was fired after deceased had turned to leave the scene of

combat.    As the result of the shooting Shoun fell after walking a very few feet, and died almost immediately.

The defendant's version of the affair, in which he is corroborated by his wife and brother, both of whom witnessed it, is very different.    They say that when Shoun came home he called to the defendant who was on his porch; that the defendant went to the fence, and that when he got there Shoun remarked to him that he understood. he was going to leave; that the defendant advised him that such was the case; that he had determined to give up his position and go somewhere else to avoid the trouble they were having, and showed the deceased the letter which the superintendent had written for him; that Shoun declined to read the letter, remarking that he cared nothing about that; that defendant was not going to leave; that he was going to kill both him and his wife before he got off the job, accompanying this statement by striking at the defendant with his right hand, and at the same time drawing from his pocket with his left hand a revolver; that the defendant dodged the blow  made at him, and immediately pulled his pistol and fired four shots in rapid succession; that immediately after he  fired Shoun made a few steps toward his house, and fell with his head on the running board of his automobile, and died befor medical assistance was procured.    There is no evidence introduced to show whether or not a pistol was found in the yard where Shoun fell.    There is evidence to show that no pistol was found upon his person after he was taken into his house.

As is apparent from this recital, the accused relied upon self defense to excuse the homicide.    In addition to this testimony of himself, fully corroborated by his wife and his brother, as to how the transaction occurred, he was permitted to introduce two witnesses who testified that a few days before the occurrence Shoun had stated to them that he was going to kill the defendant.    He was also permitted to introduce evidence showing, or tending to show, that Shoun was a dangerous man, of a quarrelsome and vicious nature; and was also permitted to prove that very shortly before the occurrence Shoun had made assaults upon him with a deadly

weapon.    He offered to testify to various acts of violence
toward other persons of which Shoun had been guilty, some
of which were within a very short time before the occur-
rence, and some more remote.    He detailed, in the absence
of the jury, what those occurrences were; that on one occa-
sion Shoun shot his wife and child, and that on another
occasion he shot his wife and the child of another person;
that he had seen him in 35 or 40 fights; that on another oc-
casion, before he left Tennessee where both of the parties
lived, he went into the house of a neighbor whose wife  was
ill, and by flourishing a pistol and threating to shoot
her, caused her death from the resulting excitement; that
on still another occasion he went into another house and ran
the occupants out and away from their premises by shooting
at them.    The court refused to permit the defendant to
testify to these occurrences, and this action of the court
forms the basis of the principal assignment of error.

It is quite well established that where self defense is re-
lied upon to excuse a homicide, and there is evidence tend-
ing to establish that defense, it is competent to show the
character of the deceased party for violence, and especially
is this true when the person charged with the crime has
knowledge of such traits of character, for the evidence not
only to some extent characterizes the acts of the deceased,
but also has a tendency to show the mental state in which
the defendant was at the time of the homicide.    In deter-
mining the guilt or innocence of one charged with murder,
where self defense is relied upon, the jury should as near
as possible be put in the position of the accused.    They
must view the occurrence from his standpoint, for it is their
province and function to determine whether or not he had
reasonable ground to fear death or great bodily harm at
the hands of the deceased.    In order to do this intelligently
they should not only be informed of the physical surround-
ings of the occurrence at the time of the homicide, but as
far as possible be acquainted with the defendant's  mental
attitude, so far as the same was induced by acts of the de-
ceased at or before the homicide.    And this mental attitude
would not only be affected by acts of violence on the part

of the deceased toward the defendant, but it would no doubt be materially affected if the defendant had knowledge of acts of violence committed by the deceased toward other persons without any, or upon very slight, provocation. We are of opinion that all of this evidence should have been admitted in order that the jury might view the occurrence from the standpoint of the defendant at the time. This conclusion is well supported by the authorities. In fact, we find no authority to the contrary. It is laid down in 13 R. C. L., title "Homicide" § 222, that where the issue is whether or not the accused had reasonable ground to believe himself in imminent danger, he may show knowledge of specific instances of violence on the part of the deceased. See also *State* v. *Thompson*, 49 Ore. 46, 88 Pac. 583, 124 Am. St. Rep. 1015, and note at page 1033; *Sneed* v. *Territory*, 16 Okla. 641, 8 Am. & Eng. Anno. Cases, 354; *State* v. *Feeley*, 194 Mo. 300, 92 S. W. 663, 3 L. R. A. (N. S.) 351, and note at page 372; *State* v. *Lull*, 48 Vt. 581.

The defendant also insists that the court erred in giving to the jury the State's instruction No. 2, for the reason that this instruction told the jury that where self defense was relied upon, the burden was upon the defendant to prove it by a preponderance of the evidence, and that in determining such question they should consider all of the evidence in the case, not only that introduced by the defendant, but that on behalf of the State as well. It is insisted that it was error to impose upon the defendant the duty of proving his defense by a preponderance of the evidence; that if he created a reasonable doubt in the minds of the jury as to whether or not he acted in self defense, he should be acquitted. Our holdings are that where the defendant admits the homicide, as is the case here, and relies upon self defense as an excuse, he must establish the same by a preponderance of the testimony. *State* v. *Hatfield*, 48 W. Va. 561. We see no reason for departing from this rule at this time.

The instruction is further criticised because it told the jury that even though they believed the defendant had been previously assaulted, if he used more force than was reasonably necessary to repel said assault or shot; or continued

to shoot after the necessity for so doing had ceased, they could not acquit him.    The criticism of this part of ·the instruction is that there is no evidence tending to show in an appreciable degree that the defendant continued to shoot after the necessity therefor ceased, or at least that if he did fire any shot thereafter it does not appear that such shot took effect. The evidence introduced on behalf of the State tends to show that the last shot was fired after the deceased had turned and was retreating, but it also appears likely that this shot did not take effect.    It does clearly appear from all of the evidence that the shots were fired in very rapid succession, in fact, one of the witnesses on behalf of the State who heard them testifies that the firing was so rapid that he did not keep count of the number of shots, and it may be doubted whether there is any substantial basis in the evidence for intimating that ·even though there was at one time a necessity for the shooting this necessity ceased before the defendant fired the last shot.    It is suggested by one of the witnessess for the State that there was a slight intermission between the last shot and the one just before it, but this witness also states that all of the shots were fired in rapid succession, and does not suggest in his testimony the length of time between the last two shots. While this evidence may be enough to justify this part of the instruction, it seems to us that it could really accomplish no useful purpose in the trial.

The defendant also assigns as error the action of the court in refusing to give an instruction asked for by him to the ·effect that one who has been threatened with a murderous attack,. and has reasonable ground to believe that it will be made, may arm himself for defense, and that no inference of malice can be drawn therefrom.    This instruction should have been given.    The fact that the defendant was~armed at the time he went to the fence to meet the deceased is made much of in the. evidence, and in his cross-examination this fact is emphasized.    Ordinarily the fact that one, who commits a homicide by the use of a deadly weapon, is armed at the time is some evidence of malice, and the jury should have been told in a case like this, where previous threats

were made against the life of the defendant, and previous murderous assaults been made upon him, that from the fact that he was armed no such inference could be drawn.      *State v. Clark,* 51 W. Va. 457.

The remaining assignment of error is to the action of the court in refusing to set aside the verdict, it being contended that the evidence does not sufficiently prove that Shoun's death resulted from the pistol shots fired by the defendant.      There is nothing in this assignment.      Shoun appeared upon the scene in life and perfect health.      In the conflict two bullets discharged from the pistol in the hands of the defendant passed through his body, and he fell and expired almost immediately.      This is sufficient to prove that his death resulted from the wounds thus inflicted.

For the errors above pointed out the judgment will be reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*