STATE OF WEST VIRGINIA

*v.*

E. H. FOLEY

(No. 9712)

Submitted September 25, 1945. Decided November 13, 1945.

*G. C. Belknap, D. L. Salisbury, M. E. Boiarsky* and *T. C. Townsend,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, and *Ralph M. Hiner,* Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

In the case of State of West Virginia against E. H. Foley from the Circuit Court of Clay County, the defendant and Ranson Kirk were jointly indicted for the murder of Joseph Groves in Clay County, West Virginia, on March 1, 1944. The defendants each having demanded a separate trial, the State elected to try Foley first, and he was tried and convicted of voluntary manslaughter and sentenced to the penitentiary. To a judgment of sentence this writ of error is prosecuted.

On March 1, 1944, defendant Foley shot and killed Joe Groves at Widen, West Virginia, with a 32 calibre Smith and Wesson revolver. The sole defense interposed was that the killing was done in self-defense.

Foley and Kirk were employed in the months of February and March, 1944, for the purpose of organizing for the United Mine Workers of America the employees of Elk River Coal and Lumber Company at Widen. On the morning of February 28, 1944, Foley, in pursuit of his employment drove to Widen. He was accompanied by Byrne Wilson and unarmed. He testified that previously on February 23, 1944, when he was driving into Widen, Elmer Groves, driving an automobile in the opposite direction, stopped Foley's car and inquired of him if he was "that G- - damned organizer", and warned: "I am telling you, by G - -, to stay out of here and don't be here when I come back." Elmer testified that he did not know Foley until he returned to Widen on February 28, 1944, after a visit. Upon arriving at Widen early in the afternoon, Foley went into the Y.M.C.A. building, where Elmer Groves and his father were seated.

Elmer Groves testified that on February 28 Foley had "backed his car out in the road and just brushed my pants' leg"; that against his father's advice he approached Foley to ask him about the car incident; that Foley spit on the floor and when Elmer told him to clean it up "said something about a damned fool"; whereupon Elmer Groves grabbed Foley, slapped him, followed him out of the building, and caught him somewhere between the door and the Foley car parked a short distance away. He denies that he choked Foley, but says that when he grabbed Foley by the collar, the latter fell down "playing possum" and arose and went to his car when someone suggested that a doctor be called. The record, however, in our opinion, does not sustain Elmer Groves' version of this incident. Foley testified, and in many particulars he is fully substantiated in this record, that while he was in the "Y" talking with Theodore Given, Elmer Groves came up to him from behind, grabbed him by the collar and said, "What the G - - damned hell are you doing back here? I thought I told you to stay out of here"; that Elmer told him to take off his glasses, reached up and caught the glasses, jostled defendant, and when de-

fendant had partly broken loose from him, knocked him down on the floor, causing his jaw to be cut almost through, so that it bled until about seven o'clock that evening; and that he got to his feet and went out the door, followed by Elmer and his father. He testified that Elmer kicked him as he went out the door; that he caught defendant near the back end of his car and hit him once or twice; that when defendant broke loose he got about half way to the door of his car, and that Joe Groves was "following, trailing right along"; that when defendant got about half way to the car door Elmer caught him again, choked him, pushed him so that he fell to the ground on his back, where he lay for some time in an unconscious condition. After Foley regained consciousness, so he testified, he went to his car, where Joe Groves, who had followed him, told him to "get the hell out of there." Upon informing Groves that he could not do so because he had left his keys in the building, Groves went back into the building and returned with Foley's keys and glasses, and said, "Now, you get your G - - damned a - - out of here and stay to hell out of here. If you come back in here bring an ambulance with you or a hearse." Defendant is corroborated in this latter incident by the witness, Tom Radcliff. Defendant says as he was talking, Joe Groves pulled back his leather jacket and witness could see the butt of a gun. Virgil Grogg testified that in the "Y", Elmer grabbed Foley, who said, "Well, wait a minute. What is this?" Icie Frame, a clerk in the Y.M.C.A., testified that as Foley was walking through Elmer stepped up to him, took him by the shoulder, and asked him, "what he was doing there trying to organize the union", jerked his glasses off, shoved him back next to the pool tables, while Foley told him he did not want to have any trouble with him, and then followed Foley out of the door. The witness Shannon Gray first saw Foley and Groves on February 28, as they were scuffling outside the building; that Foley got loose and started to run; that Joe Groves told Elmer not to let Foley get away; that after this admonition Elmer caught Foley again as he was running up to

his car, put him on the ground; and that after Foley got up, he went to his car, followed by Joe Groves.

After the encounter on February 28, Foley exhibited physical evidence of his treatment at the hands of Elmer Groves. Virgil Grogg testified that when Foley went to witness' home on the evening of February 28, his clothes were torn and dirty, and he had a scar on one side of his face. Charles C. Gressang, General Superintendent of Elk River Coal and Lumber Company, who, on the evening of February 29, 1944, had attended a meeting in Charleston at which representatives of the United Mine Workers of America, including Foley and Ranson Kirk, an independent union of the coal and lumber company's employees, and a representative of the National Labor Relations Board were present, relative to the holding of an election by the mine employees at Widen to determine which of the two competing organizations, if either, would be elected as the collective bargaining agency, testified that on that occasion he noticed a "pretty good sized" red mark on Foley's face. Kirk testified that at the meeting he noticed that Foley had a "pretty bad swollen jaw", and the witness H. O. Murphy noticed blood on Foley's face as he was leaving Widen on February 28.

On the question whether Elmer Groves was able to inflict injury on Foley, it may be noted that Foley was forty-eight years of age and weighed one hundred sixty-three pounds, and Elmer Groves, who had recently been discharged from the United States Army, was twenty-two years of age, about six feet tall, and weighed, according to the variant testimony, from one hundred seventy-seven to two hundred ten pounds.

On February 29, 1944, Elmer Groves was arraigned, pleaded guilty, and was fined before Lee Wilson, a Justice of the Peace in Clay County, on the charge that he "did unlawfully assault and beat him, the said E. H. Foley." Various witnesses testified concerning Joe Groves' activities at Widen on February 28 and 29.

Virgil Grogg testified that when Joe Groves asked Icie Frame for Foley's keys and glasses, he said, "Yes, he [Foley] promised to leave town." The witnesses Grogg, Theodore Given, William Matheny, and others for the defense, as well as the State, testified that Joe Groves followed Elmer as the latter was pursuing Foley out of the "Y". Shannon Gray testified that he first saw Foley and Groves outside the building on February 28 scuffling; that when Foley got loose, Joe Groves told Elmer not to let him get away; that Joe Groves did not do anything to stop the fight, and that when Foley went to his car Joe Groves followed him. Tom Radcliff testified that when Foley was lying on the ground after the encounter on February 28, Joe Groves walked up and said, "Don't a damned man interfere"; that when Foley broke loose and started to run toward his car, Joe told Elmer, "Don't let him get to that car or he will get his gun." According to Icie Frame, after the encounter was over, Joe said, "That boy [evidently meaning Elmer] said he would kill that man when he got back from Virginia." According to Frank Dancey, during the struggle on February 28, Joe Groves "was along with Mr. Foley and Elmer". The witness Kenna Lane testified, without objection, that it "seemed like to me Joe was trying to encourage Elmer, trying to get him to go ahead, and Joe had his right hand in his jacket pocket up here, running around and around by the side of Foley and Elmer together, telling Foley not to pull a gun." This witness testified on cross-examination that while he was standing outside the "Y", Elmer, Foley and Joe Groves were all "practically bunched up together, all three right up together." On February 28, according to the witness Alton Houghton, Joe Groves was "running around there trying to keep the others back, or seemed to be." The witnesses, Gray, Radcliff, Dancey, and Murphy testified that after Foley got up, Joe Groves followed him to his car. Several witnesses testified that Joe Groves did not do anything to stop the fight. The witness Gruder Morris testified that before the trouble on February 28, Joe Groves told him that "there was going to be some fun

around there directly. * * * Elmer was going to lick Foley whenever he came in," and that after the fight on February 28 Joe Groves told Elmer in the Y.M.C.A. building that he had done a good deed, and asked witness, "if I shook hands with Elmer, * * *."

Neely Rogers testified that on February 29, 1944, Joe Groves asked witness if her husband had joined the union; that he said, "Well, you tell him I said not to join the damned thing. * * * Because we ain't going to have it. * * * Elmer has come home and we ain't going to have that union * * * He whipped hell out of one of them the other day * * * We are going to get rid of them if we have to do some killing." The witness W. E. Perry testified that he saw Joe Groves on the evening of February 28, on which occasion Joe said, "What do you know about those fellows? Those union fellows. * * * My boy whipped one of those fellows a while ago. They said they were coming back and shoot my house off the lot. Well, they are not going to shoot me and they are not going to shoot Elmer. I am going home and load my gun and get ready for them."

The foregoing events lead us to a consideration of the happenings on March 1, 1944, when defendant killed Joe Groves.

On the day following the meeting between the representatives of the coal and lumber company, the National Labor Relations Board, and the competing unions, Kirk and Foley proceeded to Widen separately, evidently for the purpose of furthering the interests of the organization which they represented in the impending election of March 7. Before proceeding to Widen both obtained guns, Foley a 32 calibre Smith and Wesson revolver, and Kirk a 38 calibre Smith and Wesson, which they had in the pockets of their respective overcoats when they arrived in Widen. Kirk arrived first, parked his car near an Esso gasoline sign a short distance from the Y.M.C.A. building. He remained in his car, which was headed in the direction the car came into Widen. Shortly there-

after Foley arrived and parked his automobile along side of Kirk's car, a few feet away. Before parking his car, Foley walked over and talked to Kirk. The weather being cold he returned to the driver's seat of his car, and Kirk followed and assumed a seat beside him. As the two men were seated there conversing, Elmer Groves' brother, Bill Groves. came out of the Y.M.C.A., followed shortly by Elmer, and went up to the Foley car, where he says he engaged in conversation in expectation of getting a ride to Charleston. Elmer then came up to the car. According to his version, he was passing by on his way home, when someone in the car said, "That's him", and that he turned around and said, "Yes, that's him. What do you want to do about it?"; that he stepped back one step and said to Foley and Kirk, among other things, "Why don't you boys wake up and realize there's a war on here now and let these men go ahead and work." But according to Foley, Kirk, the State's witnesses, Mancel Walker and Bill Groves, and other witnesses, Elmer Groves went up to the Foley car, where he engaged in angry conversation with its occupants, stuck his head through the window of the car during the course of the conversation, or opened the door of the car, and either motioned to or told Foley to get out, or tried to pull him out of the car. State's witness, Samuel Allen, testified, without objection, that Elmer "was acting like he was wanting to fight." The witness Murphy described Elmer as "talking fast and like he was mad." The witness Dayton Hamrick testified that Elmer "apparently was angry, and making passes at" Foley like he was "trying to get hold of a man under the wheel, or to hit him, * * * and cursing and calling him names." According to Foley, Elmer, after opening the door, grabbed him in an effort to pull him out of the car. Both Kirk and Foley testified, without substantial contradiction that while they were in the car, Elmer addressed them in blasphemous language, too vulgar to be stated in this opinion, and likewise without contradiction Foley stated that Elmer told him, "I beat the hell out of you the other day. I thought you was going to stay out of here"; and, after accusing

Foley and Kirk of having guns said, "We have got guns, too." With blasphemy and vulgarity, he called Kirk a foreigner, and in response to this language the uncontradicted evidence is to the effect that Foley tried to explain to Elmer the arrangement about the impending election, and both Foley and Kirk admonished Elmer to leave them alone. Kirk got out on his side of the car, and Elmer proceeded around it, where he encountered Kirk. Foley got out from the driver's side and proceeded around the car.

Witnesses testified variously as to what happened between Kirk and Elmer Groves as the latter approached the former. Some witnesses say that Elmer pushed or hit Kirk. There is testimony to the effect that Kirk pulled a gun partly out of his overcoat pocket, and then put it back. But the record seems clear that two of Elmer's friends, Benny Vaughn and Joe Ward, took hold of Elmer and proceeded to take him toward a bridge leading to the Groves home. In the meantime, Foley came around the car, and he and Kirk stood on the side of the car next to the bridge. When Elmer and his two companions had proceeded some distance in the direction of his home, variously estimated from ten to one hundred feet, Elmer broke away and started at Kirk at a rapid pace for the purpose, as he expressed it, of giving "him [Kirk] a whipping." What prompted Elmer's action was a remark which Kirk made, in response to Elmer's remark to the effect that he would be back and that Foley and Kirk "had better be gone." Witnesses testified variously as to what Kirk said. Elmer and Bill Groves testified, respectively, that Kirk said, "You better get him home and keep the coward there" and "Take him on home and keep him there, the coward"; but three witnesses for the State, Elmer's mother, Mrs. Baker, and Donald Nettles, and other witnesses testified that Kirk, in substance said, "Get home and stay there". No other witness testified that Kirk made the remark Elmer and Bill Groves said he made. There is evidence to the effect that immediately prior to Elmer's being led away,

Kirk told Joe Groves to "take him away from here. I don't want to hurt him."

As Elmer approached the two men on his way back, according to the variant testimony of the witnesses, Kirk and Foley either stood still or stepped backwards. Bill Groves testified that as Elmer proceeded toward Kirk and Foley, Joe Groves followed only "a couple of steps behind him"; that both Kirk and Foley stepped back, the latter disappearing into the crowd. He testified, on direct examination, that when Elmer started toward Kirk, his father "was right behind him." A number of witnesses testified that as Kirk was backing away, he asked or motioned to Elmer to stop. When Elmer was within a short distance of Kirk, the latter took his gun from his pocket and fired. The evidence seems to predominate that the first two shots were fired into or near the ground, but whether Elmer was struck by the first one or two shots fired by Kirk, this record discloses clearly that he kept on in Kirk's direction until he was able, as he did, to grab Kirk and force him to the ground, with Kirk lying underneath his body. Elmer was shot four times: in the right chest, high in the left thigh, the upper part of the right thigh, and through the lateral surface of the upper part of his left leg. The evidence conflicts as to whether all of the shots which entered Elmer Groves' body were fired by Kirk. Elmer testified that Kirk shot him in the leg and thigh, but he did not know who shot him in the left hip and right breast. But Kirk testified that though he asked Elmer to stop several times, he kept on coming toward witness who, backing at the time, shot Elmer in the leg in an effort to stop him; that he shot Elmer a second time in the hip, shot again while he and Elmer were falling, and finally raised the gun and shot Elmer in the breast while the two were on the ground. This testimony, if taken as true, accounts for all the shots which Elmer received. The evidence, in our opinion, is such that a jury could infer that Kirk shot Elmer four times.

During the course of this affray, when Bill Groves

first saw Foley near the steps going into the "Y", he saw his father going toward Foley, at which time Foley fired. Several of the State's witnesses assert that Joe Groves did not attack Foley until the latter had pointed his gun at Elmer, but State's witness, H. V. Wilson, testified that, "Him and Joe was into a scuffle and he pulled the gun out of his pocket." Foley testified that he fired for the first time when he saw Joe Groves coming toward him "in a vicious, violent manner, whispering something to himself", and then not until Groves was three feet away from him. His testimony is to the effect that almost simultaneously with the first shot, Joe Groves gave him a glancing blow; that when he fired a second time, Groves knocked him down, and while the two were struggling, he fired the third time. This testimony, if true, accounts for all three shots received by Joe Groves.

The record contains substantial evidence to the effect that as Elmer pursued Kirk on March 1, Bill Groves followed closely, and when Kirk was on the ground with Elmer on top, he kicked Kirk in the head one to several times. Bill Groves testified that when Kirk was leaving Widen after the shooting, he threw a brick through the window of Kirk's car with the intention of hitting him, and then went to the Foley car and told Foley to get out and stay out of town. Prior to the time that Bill Groves and Elmer went to the Foley car on March 1, Kirk saw Bill go from home to the Y.M.C.A. and back, and then to the Y.M.C.A. and over to the car; and saw Joe Groves go from home to the "Y" and back home, then to the "Y", and thence to the bridge leading to the Groves home.

On their respective cross-examinations, both Kirk and Foley answered in the negative the question addressed to them by the State's attorneys whether "* * * you had a license to carry a pistol in Clay County on the 1st day of March, 1944?", the objections of defendant's counsel to this inquiry being overruled by the court.

Both the State and the defendant offered instructions. Instructions Nos. 21, 22, 23, 24, and 26, offered by de-

fendant, embody defendant's theory of defense that Joe Groves and his sons, Elmer and Bill, had either conspired, or acting together had engaged in aggressive action, against defendant for the purpose of inflicting bodily harm upon him. The court refused all instructions and in lieu thereof gave a charge to the jury, which in general dealt with the theory of self-defense. Defendant objected to this charge on the principal ground that the court instructed the jury "that a father has the same right to protect and defend his son as he has to protect and defend himself if he were in the same position and surrounded by the same circumstances and conditions as his son", but did not include in the charge an instruction "on the question of conspiracy in so far as it relates to those conspired against, E. H. Foley and Ranson Kirk, as shown by the testimony in this case, and along the line contained in the instructions offered on behalf of the defendant."

Bearing on the question of self-defense, Foley testified that at the time he fired the shots resulting in Joe Groves' death, he believed that his life was in danger, and that he was in danger of great bodily harm at the hands of Joe Groves. He gave his reasons for watching Joe Groves as "First, was he didn't take any action to stop the first fight or intercede; second, he made some threats to me at the car a couple of days before that and when we pleaded with him there this day he did not take any action." He further testified, "I knew my life was in danger and I thought he was—I thought he would kill me with it [Foley's gun]. I was struggling for my life." Kirk testified that at the time he shot Elmer Groves he believed it was necessary to save his life or to prevent him from receiving great bodily harm at the hands of Elmer Groves. On cross-examination he testified that in connection with his ordinary duties he did not carry firearms but he "had this gun on that particular day because of what happened to Mr. Foley and direct information to me as to what was going to happen to me when I came over." The admissibility of that part

of the statement "direct information as to what was going to happen to me" does not arise. The answer was elicited by the State's counsel.

Several witnesses testified to the effect that Elmer Groves' general reputation in the community for being quarrelsome and dangerous was bad.

Only two grounds of error are asserted in defendant's brief: "(1) The trial court erred in permitting counsel for the prosecution to inquire of the accused and also of defense witness Kirk, on cross-examination, and in requiring them to answer, if they, respectively, had a license to carry a pistol in Clay County on March 1, 1944;" and "(2) The trial court erred in failing to give defendant's instructions relating to conspiracy and in failing to include that theory of defense in its charge to the jury."

Defendant's first assignment of error that the trial court erred in permitting the inquiry of Foley and Kirk whether they, respectively, had a license to carry a pistol in Clay County on March 1, 1944, and in requiring them to answer, should be reviewed in conjunction with defendant's theory of self-defense. In our opinion, there is sufficient evidence in this record from which a jury could infer that, while Elmer Groves was being led away from the vicinity of Foley's car toward his home, he broke away and came toward Kirk in a menacing manner followed closely by Joe and Bill Groves; that Kirk did not shoot Elmer until the latter was only a few feet away, and then for the first time he shot low in an effort to stop Elmer. While the evidence conflicts as to Foley and Joe Groves' actions immediately leading up to the killing, there is substantial evidence to the effect that as Elmer proceeded toward Kirk, Joe Groves went toward Foley; that both Foley and Kirk stepped back in the face of the attack, the latter backing almost to the "Y" building; that Foley's first shot was at Joe Groves when the latter was approaching him in a "vicious, violent manner"; and that all of Foley's shots were directed toward

Joe Groves. In fact there is evidence from which a jury reasonably could infer that Foley did not shoot Joe Groves until the two had clinched. It was for the jury to say whether the foregoing account of the affray is true. And, if it is true, it justified defendant's action in shooting Joe Groves, provided at the time and place of the killing Foley believed that he was in imminent danger of losing his life or suffering great bodily harm and that he had reasonable ground to believe it was necessary to shoot and kill his adversary in the situation in which he found himself and further that he did so believe. In appraising the necessities of the situation which confronted Foley and Kirk on March 1, the respective ages and sizes of the persons involved should be considered. Joe Groves and Foley were almost the same age, the former weighing from one hundred seventy-five to two hundred pounds and the latter one hundred sixty-three, and Kirk, who was about Foley's age, weighed one hundred forty-eight pounds to Elmer's weight of one hundred seventy-seven pounds to two hundred ten pounds. In *State v. McCallister*, 111 W. Va. 440, syl., 162 S.E. 484, this Court held: "Where one without fault is assaulted he may shoot or wound his adversary in defense of his person without retreating if he has reason to believe and does believe that there is design on the part of his adversary to take his life or do him great bodily harm. But he does so at his peril, for it is a question for the jury to determine the necessity of such shooting under all the evidence and circumstances. The necessity for killing or wounding in self-defense presents a question for jury determination." But did defendant and Kirk have a right to arm themselves for self-defense on the occasion of their visit to Widen on March 1? In *State v. Hardin*, 91 W. Va. 149, 112 S.E. 401, cited with approval in point 2 of the syllabus in *State v. Summers*, 118 W. Va. 118, 188 S.E. 873, 875, this Court held: "One who has been attacked, or is threatened with a murderous attack which he had reason to believe will be made, may arm himself for defense, and in such case no inference of malice can be drawn

therefrom." See also *State* v. *Clark*, 51 W. Va. 457, 41 S.E. 204; and 1 Lee, The Criminal Trial in the Virginias, Section 693, and the same rule, in our opinion, applies to Kirk.

Of course, the application of the foregoing rules governing the law of self-defense would not apply to the ·instant case if Kirk and Foley armed themselves and went to Widen for the purpose of doing violence. Nothing in this record indicates that the two organizers were in Widen on March 1 for the purpose of inciting or doing violence. They were there for a lawful purpose; they had a right to go to Widen for the purpose of informing the members of their organization of the impending election which was set for March 7, 1944, and which was to be held under the supervision of the National Labor Relations Board, and by peaceful persuasion to urge others to participate in the election; and, by the same token, no one had a right by violence to prevent them from so furthering the interest of the cause they represented. Notwithstanding Foley went to Widen on February 28, for the purpose of arranging to take a committee of his organization to attend the Charleston meeting, he was met with a violent and unwarranted attack by Elmer Groves, and threats by Joe Groves, which we have suggested would justify him in believing that he would be met with a like attack upon his return to Widen. Not only he, in the circumstances of this case, but Kirk, who knew of the happenings on February 28, 1944, and saw Foley's physical condition after the attack had the right to believe that if he went to Widen for the same purpose, he likewise would be subjected to such an attack.

But notwithstanding the foregoing the question still arises as to whether the questions propounded and the answers given were proper. In *State* v. *Friedman*, 124 W. Va. 4, 18 S.E. 2d 653; *State* v. *Mullenax*, 124 W. Va. 243, 20 S.E. 2d 901; *State* v. *McMillion*, 127 W. Va. 197, 32 S.E. 2d 625, this Court held that a defendant in a criminal case who voluntarily becomes a witness in his

own behalf may, under Code, 57-3-6, be required to state, in response to questions propounded on cross-examination whether he has been convicted of other offenses. This statute provides, among other things, that "In any trial or examination in or before any court or officer for a felony or misdemeanor, the accused" if he "voluntarily becomes a witness he shall, as to all matters relevant to the issue, be deemed to have waived his privilege of not giving evidence against himself and shall be subject to cross-examination as any other witness * * *". It is to be noted that under the statute considered in the *Friedman* and kindred cases, the defendant waives his privilege of not giving evidence against himself when he voluntarily becomes a witness only "as to all matters relevant to the issue." The law of self-defense is part and parcel of the law of homicide, and the right to arm for self-defense is distinct from a license to carry a pistol under Code, 61-7-1, which makes it a misdemeanor for a person to carry a pistol without the license provided by the statute. Whether Foley had a license to carry a pistol on the occasion he was armed is not relevant in the least to the common law right to arm for self-defense. We agree with the reasoning of the Court in *State* v. *Doris*, 51 Ore. 136, 165, 94 P. 44: " * * * to hold that the mere fact that a person accused of a homicide was armed at the time, and that because of the misdemeanor resulting therefrom he shall be deprived of any right of self-defense, would lead to the absurd and unjust consequence in practically all cases of depriving the accused of any defense, whether such person is in the right or wrong, and whether his acts were necessary to save his life or to avoid receiving great bodily injury or not. The jury had the right to take into consideration the fact that the defendant was carrying a pistol at the time only in so far as that incident was connected with the homicide." In Wharton's Criminal Evidence, Vol. 1, page 452, it is stated: "* * * the fact that he was carrying a weapon contrary to the statute did not deprive him of the right to use such weapon in self-defense." For us to hold otherwise would add a new and unknown element

to the age-old law of self-defense which has prevailed in this jurisdiction. We are not at liberty in this case to appraise again the decisions in the *Friedman, Mullenax* and *McMillion* cases. We simply say that the evidence of former convictions was held admissible in those cases because it went to the question of defendant's credibility. It is difficult to see how the questions propounded and the answers given in response thereto bear on Foley's credibility. This Court years ago decided against the propriety of interjecting into a criminal case the mere accusation of another offense against the accused, for which he was not being tried. In *Watts* v. *State*, 5 W. Va. 532, it was held that on an indictment for procuring persons to shoot, cut, stab and wound with intent to maim other persons that it was error to admit testimony of a rape committed by one of the persons procured after such persons had broken into a building, where the persons sought to be maimed were lodging. In substance the Court held that the rape was a distinct, substantive offense from that charged in the indictment, had no connection whatever with the offense charged, and the defendant could not be held responsible as accessory thereto.

The questions and answers are violative of West Virginia Constitution, Article III, Section 5, which provides that no person shall, in a criminal case, be compelled to be a witness against himself. The objectionable questions and answers involved the commission of a crime which, in our opinion, is wholly unrelated to the crime for which the defendant was on trial. It has been held that a defendant in a criminal action cannot be compelled to give self-incriminating testimony as to another offense wholly unrelated to the one for which he is on trial, for the purpose of testing his credibility. 3 Wharton's Criminal Evidence, Section 1145; *Wiereman* v. *Comm.*, 203 Ky. 57, 261 S.W. 862; *State* v. *Allemand*, 153 La. 741, 96 So. 552; and *Saylor* v. *Comm.*, 97 Ky. 184, 30 S.W. 390. In *State v. Burnette*, 118 W. Va. 501, 507, 190 S.E. 905, decided after the enactment of Code,

57-3-6, this Court said: "On cross-examination, defendant was asked by the prosecuting attorney whether about a year before the trial he had shot a man while attempting to arrest him. On objection being made by the defendant, the prosecuting attorney stated he would not insist on an answer. The court directed the jury to disregard the question. The defendant urges that the mere asking of the question involved prejudice to him. Such a question should not be asked. There is no possible justification for it. It is flagrantly violative of fundamental principles which are so familiar to all lawyers and judges that further discussion is unnecessary." Foley, being the defendant, it was unnecessary for him to assert the privilege. 6 Jones' Commentaries on Evidence, 2d Ed., Section 2494, Note 1. But the rule is otherwise as to Kirk. He voluntarily took the witness-stand and there being no statute providing otherwise, he was subject to cross-examination like any other witness, and if he desired to assert his constitutional immunity against self-incriminating or degrading questions, he and not Foley's counsel should assert the privilege personally. In *State* v. *Hill*, 52 W. Va. 296, 43 S.E. 160, it was held that the privilege of a witness other than the defendant to refuse to answer a question which will degrade is personal to him and cannot be used by a party; but we think that the trial court should have advised Kirk as to his privilege.

But in our opinion the questions propounded and the answers elicited from both Foley and Kirk constituted reversible error for the further reason that both, while engaged in a common undertaking, were held before the jury as law violators. The propounding of the question to Kirk and his answer tended to emphasize the error committed by the court on Foley's cross-examination. See generally *State* v. *Seckman*, 124 W. Va. 740, 22 S.E. 2d 374; *State* v. *Morris and Johnson*, 96 W. Va. 291, 292, pt. 3 syl., 122 S.E. 914. The objectionable matter in the cross-examination as the Court said in the *Morris and Johnson* case "can only be for the purpose of prejudicing the jury."

Defendant's second assignment of error is based upon the theory that Joe, Elmer and Bill Groves had conspired against Foley and Kirk for the purpose of inflicting bodily harm upon them. Defendant objected to the court's charge and moved that the instructions prepared by defendant be given in lieu of the charge. In appraising the objections to the charge, we must consider in view of defendant's second assignment of error, defendant's instructions Nos. 21, 22, 23, 24, and 26 offered by defendant and refused by the court. Defendant's instruction No. 21 reads as follows:

"The Court instructs the jury that where there is more than one assailant, the slayer has the right to act upon the hostile demonstration of either one or all of them, and to kill either one or all of them, if it reasonably appears to him that they were present for the purpose and acting together to take his life or to do him some serious bodily injury."

Defendant's instruction No. 24 reads:

"The court instructs the jury that if you believe from the evidence in this case that the deceased, Joe Groves, Elmer Groves and Bill Groves, or either of them, committed any overt act, or that there were circumstances brought about by them of such character as to afford to the defendant, Ezra H. Foley, a reasonable ground for believing, and that he did believe, the deceased, Joe Groves, by himself or in conjunction with Elmer Groves and Bill Groves, or either of them, designed to kill him or to do to him some great bodily harm, and that there was imminent danger of carrying said design into immediate execution at the time of the killing, then, under such circumstances, the defendant had the right to act upon such appearances and to kill the said Joe Groves, Elmer Groves and Bill Groves, or any one of them acting in conjunction with him, and, under such circumstances, the killing was excusable, although it may afterwards turn out that the appearances were deceptive and false and that there was, in fact, neither a design on the part of the said Joe Groves, Elmer Groves and Bill

> Groves, or any one of them, to kill the said Ezra
> H. Foley or to do him some great bodily harm,
> but of all this the jury must judge from the
> facts and circumstances of the case."

Defendant's instructions Nos. 22, 23, and 26 are based upon a claimed conspiracy of Joe, Elmer and Bill Groves, acting in concert, to do bodily harm to Foley and Kirk. In appraising the question whether the trial court erred in refusing to incorporate the foregoing instructions in its charge, it is unnecessary for us to repeat in detail the evidence bearing upon the activities of Joe, Elmer and Bill Groves on February 28 and 29 and March 1. The evidence that Elmer "was going to lick Foley whenever he came in"; Joe Groves' failure to dissuade Elmer from his assault on Foley; his warning to Foley after the fight on February 28 to stay "out of here", and if he should come back "to bring an ambulance with him or a hearse"; and the evidence tending to show that on March 1 at the time Elmer was advancing on Kirk, Joe Groves, followed by Bill Groves, approached Foley, coupled with other activities of both Joe and Bill Groves already stated in this opinion, are such that it was for the jury to say whether Joe Groves, in conjunction with his two sons, acted in concert to injure Foley and Kirk. In Wharton on Homicide, page 396, it is stated: "So, where several persons are acting together aggressively toward another, and because of their acts or the acts of either of them, it reasonably appears to him that his life is in danger, or he is in great danger of bodily harm, he may slay any of such persons or all of them, if it reasonably appears to him to be necessary so to do to protect himself from death or great bodily harm. * * *" And in Warren on Homicide, Permanent Ed., Section 148, page 642, it is said: "Where several are apparently preparing to join in an attack on defendant, his right to self-defense extends to each participant." In *Seeley* v. *State*, 43 Tex. Cr. App. 66, 63 S.W. 309, it was held that in a criminal case involving self-defense, the jury should have been instructed that where a defendant was in danger of losing his life or suffering great bodily harm

from more than one assailant, acting together, that defendant had a right to defend against all assailants. Under these authorities, defendant's instructions Nos. 21 and 24, or their equivalent, should have been incorporated in the charge.

However, defendant's instructions Nos. 22, 23, and 26 are based upon conspiracy. Webster's New International Dictionary, 2d Ed., Unabridged, defines conspiracy: "An agreement, manifesting itself in words or deeds, by which two or more persons confederate to do an unlawful act, or to use unlawful means to do an act which is lawful." As the record does not disclose any agreement among the three Groves to injure Foley and Kirk, but contains evidence tending to show that on the day of the killing they acted in concert to do bodily harm to defendant and Kirk, the instructions, embracing the element of conspiracy, were properly refused.

The errors committed by the trial court in regard to the two matters urged here, in our opinion, were prejudicial. Error in the admission of evidence in a criminal case is presumed to be prejudicial, and is cause for reversal, unless it is apparent that the jury's verdict could not have been influenced by it. *State* v. *White*, 81 W. Va. 516, 94 S.E. 972. Even in the absence of such presumption the questions addressed to the two witnesses and the answers elicited from them might have prejudiced the jury. While it was for the jury to say from the evidence whether defendant had the right to use the revolver with which he was armed in the manner portrayed by the record, the fact that the court required the witnesses respectively to answer the question whether he had a license to carry a pistol in Clay County on March 1, 1944, might indicate to the jury that neither had the right to shoot in the absence of a license to carry a pistol, as required by statute. True, this reasoning is *non sequitur*, but neither this Court nor the trial court can say for a certainty that the jury did not so reason when it discarded defendant's theory or self-defense. The refusal of the trial court to incorporate defendant's

instructions Nos. 21 and 24, or their equivalent, was prejudicial under the holding of the Court in *State* v. *Alie*, 82 W. Va. 601, 607, pt. 7, syl., 96 S. E. 1011, to the effect that "Where there is competent evidence tending to support a pertinent theory in the case, it is the duty of the trial court to give an instruction presenting such theory when requested so to do."

For the foregoing reasons we reverse the judgment of the Circuit Court of Clay County, set aside the verdict of the jury, and grant defendant a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*

Fox, Judge, concurring:

I concur in the reversal of the judgment of the trial court, and in granting the defendant, Foley, a new trial, on the ground that the admission of the testimony of Kirk and Foley that, on the day of the homicide, they did not have a state license to carry a pistol in Clay County, which testimony was elicited from them, over the objection of Foley, on their respective cross-examinations, was prejudicial error. Either of these witnesses could have properly declined to answer the question propounded to him; one, Kirk, because the answer might tend to degrade or incriminate him, and the other, Foley, on the same ground, and the additional one that a defendant may not be required to testify against himself, even where he elects to testify on his own behalf, where the testimony sought is irrelevant to the issue. Code, 57-3-6. It seems to me that in this case, where the sole issue was whether the defendant was justified in killing Joe Groves in the exercise of his right of self-defense, the question of whether he had a state license to carry the pistol he used in that killing was irrelevant and immaterial. The carrying of a pistol without a state license is, in itself, a crime, for which the statute provides a punishment; but, notwithstanding this, a person in fear from knowledge of threats of death or great bodily harm, may, without a license choose to arm himself with a pistol and take the risk of punishment, and

if, later, he has justifiable cause to use that pistol in his defense and commits homicide, I do not believe the fact that he carried the pistol used therein without a license, is proper testimony to go to a jury in the trial of a charge growing out of its use. I was at first inclined to doubt whether, in the circumstances of this case, the admission of this testimony was prejudicial to the defendant, Foley, but have reached the conclusion that it was prejudicial. With this testimony before them, the jury might well have believed that Foley unlawfully armed himself and went to Widen, expecting or even seeking trouble. Without this testimony, the jury only knew that he was armed with a pistol on the day of the homicide, and would have considered the question of self-defense uninfluenced by the knowledge that the weapon used in that defense was being carried by Foley in violation of law. The challenged testimony may well have prejudiced the defendant in his plea of self-defense. If doubt exists as to this, we resolve that doubt in favor of the defendant. The principle applied in *State* v. *Rush*, 108 W. Va. 254, 150 S.E. 740, and *State* v. *Smith*, 119 W. Va. 347, 193 S.E. 573, is based upon the theory that the record before the court was clearly not prejudicial.

I am also of the opinion that the defendant, Foley, was clearly entitled to take into consideration and act upon the state of affairs around him at the time he fired the fatal shots. If he had reasonable ground to believe, and did believe, that Joe Groves and Elmer Groves, and possibly Bill Groves, were operating in concert to kill, or to inflict great bodily harm upon him, he was entitled to an instruction on that point. I think an instruction should have been given along the line of instructions Nos. 21 and 24 offered by the defendant. I do not believe the general instruction given by the court covers this theory of defendant's defense. I do not believe instructions Nos. 22 and 26, offered by the defendant, based on the theory of conspiracy, should have been given, or that any general instruction on that theory would have been justified, for the reason that, in my

opinion, there was no evidence of conspiracy, but only evidence from which Foley might reasonably have believed that there was concert of action against him on the part of Joe, Elmer and Bill Groves, and that alone did not amount to establishing a conspiracy, or even create a basis for the giving of an instruction on the theory of conspiracy.