529 S.E.2d 341

Catherine H. REYNOLDS, Individually and in Her Own Capacity; and Catherine H. Reynolds, By and Through Roy A. Horning, Her Power of Attorney, Plaintiff Below, Appellants,

v.

CITY HOSPITAL, INC., a West Virginia Corporation; and C. Dong Park, M.D. Defendants Below, Appellees.

No. 25831.

Supreme Court of Appeals of West Virginia.

Submitted on Rehearing Jan. 12, 2000.

Decided March 10, 2000.

Dissenting Opinion of Justice Starcher April 21, 2000.

Laura R. Rose, Mary Binns–Davis, Rose & Associates, Martinsburg, West Virginia, Attorneys for Appellant.

William E. Galeota, Kenneth E. Barton, Jr., Tracey B. Dawson, Steptoe & Johnson, Martinsburg, West Virginia, Attorneys for City Hospital.

Curtis G. Power, III, Bowles Rice McDavid Graff & Love, Martinsburg, West Virginia, Attorney for C. Dong Park, M.D.

PER CURIAM:

This appeal was filed by Catherine H. Reynolds, appellant/plaintiff (hereinafter referred to as "Ms. Reynolds"),[1] from an adverse jury verdict in a medical malpractice action prosecuted against City Hospital, Inc., appellee/defendant (hereinafter referred to as "the Hospital"), and Dr. C. Dong Park, appellee/defendant (hereinafter referred to as "Dr. Park"). The case was tried before the Circuit Court of Berkeley County. Ms. Reynolds contends that the trial court erred by (1) refusing to give certain jury instructions and (2) admitting evidence regarding Medicare. Additionally, Ms. Reynolds contends that the jury's verdict was against the clear weight of the evidence. Upon a review of the arguments of parties, the record presented for consideration on appeal, and the pertinent authorities, we find that there was no reversible error in the trial of this case. As such, we affirm the jury verdict imposed by the Circuit Court of Berkeley County.

Subsequent to the July 9, 1999, initial release of this opinion, the Appellants filed a Petition for Rehearing pursuant to Rule 24(a) of the West Virginia Rules of Appellant Procedure. That petition was granted by this Court, and counsel for the Appellants presented briefs and oral argument regarding

1. Ms. Reynolds was named as a plaintiff individually and as a plaintiff by and through her power of attorney, Roy A. Horning.

the allegation that counsel was precluded at trial from asserting various arguments due to the lower court's failure to furnish certain requested jury instructions.

Upon further deliberation, research, and evaluation of the trial transcripts and arguments of counsel for all parties, this Court hereby reaffirms the lower court's determination in this matter, having concluded that this case was fairly tried before a fair, impartial, and properly instructed jury. The lower court's refusal to instruct the jury in the language requested by the Appellants was not error and did not unfairly limit counsel's argument on behalf of the Appellants.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Ms. Reynolds was admitted to the Hospital by her treating physician, Dr. Park, on January 14, 1994,[2] as a result of a fall she had while at home. Dr. Park recommended that Ms. Reynolds undergo testing regarding low-back pain she sustained from the fall at her residence.

Ms. Reynolds remained in the Hospital for approximately one month. While hospitalized, Ms. Reynolds twice fell out of bed. The first fall resulted in a shoulder injury. For two weeks after the first fall at the Hospital, Ms. Reynolds was physically restrained while in bed. Shortly after the physical restraints were removed, Ms. Reynolds again fell out of bed. Her second fall resulted in a hip injury.

Subsequent to Ms. Reynolds' release from the Hospital, she filed the instant medical malpractice action against the Hospital and Dr. Park. The case was tried before a jury on December 2 through 10, 1997. The jury returned a verdict in favor of the Hospital and Dr. Park. From this adverse jury verdict, Ms. Reynolds now appeals.

## II.

### STANDARD OF REVIEW

This Court has previously held:

[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). *See also* Syl. pt. 1, *Andrews v. Reynolds Mem'l Hosp., Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997). We noted recently in *Gum v. Dudley*, 202 W.Va. 477, 482, 505 S.E.2d 391, 396 (1997), that in reviewing an order denying a new trial, we review "the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed de novo." *Accord* Syl. pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996).

With this overall standard of review in mind, we turn to the assignments of error in this case.

## III.

### DISCUSSION

On appeal to this Court, Ms. Reynolds assigns three errors she claims were committed by the circuit court. First, Ms. Reynolds contends that the trial court improperly refused to give certain of her proffered jury instructions. Second, Ms. Reynolds argues that the lower court erroneously admitted evidence of Medicare during the trial proceedings. Third, Ms. Reynolds complains that the trial court incorrectly denied her motion for a new trial. We will consider each of these assigned errors in turn.

#### A. The Trial Court's Refusal Give Certain Jury Instructions

Ms. Reynolds complains that the trial court refused to give certain jury instructions proffered by her. This Court has held that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly in-

---

**2.** At the time of her admission to the Hospital, Ms. Reynolds was eighty-six years old.

structed is a question of law, and the review is de novo." Syl. pt. 1, *State v. Hinkle,* 200 W.Va. 280, 489 S.E.2d 257 (1996). *See also Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996); Syl. pt. 6, *Voelker v. Frederick Bus. Properties,* 195 W.Va. 246, 465 S.E.2d 246 (1995); Syl. pt. 6, *Tennant v. Marion Health Care Found., Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995). In *Skaggs,* we stated:

> [t]o challenge jury instructions successfully, a challenger must first demonstrate the charge as a whole created a substantial and ineradicable doubt about whether the jury was properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.

198 W.Va. at 70, 479 S.E.2d at 580. *See also* Syl. pt. 2, *Roberts v. Stevens Clinic Hosp., Inc.,* 176 W.Va. 492, 345 S.E.2d 791 (1986); Syl. pt. 3, *Lambert v. Great Atl. & Pac. Tea Co.,* 155 W.Va. 397, 184 S.E.2d 118 (1971).

Finally, in Syllabus point 4 of *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), we observed:

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misle[d] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, as long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific

instruction will be reviewed only for an abuse of discretion.

*See Kessel v. Leavitt,* 204 W.Va. 95, 144, 511 S.E.2d 720, 769 (1998), *cert. denied,* 525 U.S. 1142, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999). Within these legal principles, we examine separately Ms. Reynolds' assignment of error relating to jury instructions.

1. **Failure to instruct the jury pursuant to *McGraw v. St. Joseph's Hospital.*** Ms. Reynolds requested the trial court provide an instruction to the jury that expert testimony is unnecessary when determining negligence by allowing a person to fall from a hospital bed. More significantly, Ms. Reynolds contends that this Court's decision in *McGraw v. St. Joseph's Hospital,* 200 W.Va. 114, 488 S.E.2d 389 (1997), is controlling. In contrast, the defendants contend that *McGraw* is relevant only at the summary judgment stage and that *McGraw* was not intended as a basis for giving a jury instruction. We agree.

In *McGraw,* the plaintiff was twice dropped by hospital personnel. Additionally, he fell out of bed. At issue in *McGraw* was whether the trial court correctly granted summary judgment against the plaintiff because the plaintiff had no expert to support his claim that the defendant failed to meet the standard of care necessary to prevent the patient from falling out of bed or from being dropped. We rejected the trial court's ruling and held that "[t]he standard of nonmedical, administrative, ministerial or routine care in a hospital need not be established by expert testimony, because the jury is competent from its own experience to determine and apply a reasonable care standard." Syl. pt. 9, *McGraw,* 200 W.Va. 114, 488 S.E.2d 389. Our holding in *McGraw* was narrowly confined to the issue of withstanding a motion for summary judgment. It was not intended to be the basis for a jury instruction.[3]

---

**3.** More relevant to the trial stage of a medical malpractice case is this Court's decision in *Totten v. Adongay,* 175 W.Va. 634, 337 S.E.2d 2 (1985). In *Totten* the plaintiffs (husband and wife) brought a medical malpractice action against a defendant doctor for failing to properly diagnose and treat an arm injury suffered by Mr. Totten. The case proceeded to trial before a jury. At the conclusion of the plaintiffs' case-in-chief, the trial

court, in *Totten,* granted judgment as a matter of law to the defendant on the grounds that the plaintiffs failed to present expert testimony on the standard of care. We rejected the trial court's ruling and held in Syllabus point 4 of *Totten* that:

> In medical malpractice cases where lack of care or want of skill is so gross, so as to be

We need not decide today to what degree, if any, *McGraw* impacts the trial of a medical malpractice case for two reasons. First, Ms. Reynolds actually presented medical expert testimony from a nurse, Michelle Taylor, and a physician, Dr. Gary Gibson. Unlike *McGraw*, this was not a situation where the plaintiff had no expert. Each side in this litigation had expert testimony. Most importantly, the trial court gave an adequate instruction regarding the weight to be given to expert testimony. The trial court charged the jury as follows:

> The Rules of Evidence provide that if scientific, technical, or other specialized knowledge might assist a jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify and state his or her opinion concerning such matters. However, expert testimony is no more conclusive than the testimony of any other witness.
>
> Just as in the case of nonexpert witnesses you may from all of the foregoing considerations and all other evidence and circumstances appearing in the trial give to the testimony of each expert witness such credit and weight as you believe such evidence is entitled to receive. Furthermore, after weighing and considering the testimony and opinion of an expert witness, you may believe or disbelieve the testimony and the opinion of such witness in whole or in part.

Ms. Reynolds contends that by failing to give a purported *McGraw* instruction, "the jury was left with the impression that it must decide the issue of negligence against City Hospital and Dr. Park strictly from the expert witness testimony." This argument appears quite disingenuous juxtaposed to the trial court's instruction advising the jury they may disregard expert testimony if they so choose. Based upon the actual instruction given by the trial court, we find no basis to rule that error was committed by the trial

court's refusal to give a purported *McGraw* jury instruction.

**2. Refusal to instruct the jury on the plaintiff's theory of the case.** Ms. Reynolds next contends that she tendered an instruction on her theory of the case, which was rejected by the trial court. We have long held that "[w]here [in a trial by jury] there is competent evidence tending to support a pertinent theory in the case, it is the duty of the trial court to give an instruction presenting such theory when requested so to do." Syl. pt. 3, *State v. Foley*, 128 W.Va. 166, 35 S.E.2d 854 (1945). We have also indicated that "[i]t will be presumed that a trial court acted correctly in giving or in refusing to give instructions to the jury, unless it appears from the record in the case that the instructions given were prejudicially erroneous or that the instructions refused were correct and should have been given." Syl. pt. 9, *Craighead v. Norfolk & Western Ry. Co.*, 197 W.Va. 271, 475 S.E.2d 363 (1996). *Accord* Syl. pt., 1, *State v. Turner*, 137 W.Va. 122, 70 S.E.2d 249 (1952).

Ms. Reynolds requested that the trial court instruct the jury that it may find negligence on the part of the Hospital if it found that the Hospital failed to do any of the following:

1. Administer P.R.N. (as needed) medications in an appropriate manner or amount;

2. Initiate or follow safety precautions for Mrs. Reynolds after her first fall on January 16, 1994;

3. Catheterized Mrs. Reynolds, unnecessarily, immediately upon admission and at other times throughout her hospitalization;

4. Promptly clean Mrs. Reynolds from her own waste products;

5. Place the nurse call button in a position where it could be easily reached by Mrs. Reynolds; or

---

apparent, or the alleged breach relates to non-complex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience, failure to present expert testimony on the ac-

cepted standard of care and degree of skill under such circumstances is not fatal to a plaintiff's prima facie showing of negligence. 175 W.Va. 634, 337 S.E.2d 2.

6. Appropriately restrain, check and document Mrs. Reynolds' condition.

The Hospital contends, and we agree, that these proffered instructions do not constitute a theory of the case. Instead, they are conclusions properly suited for closing argument by counsel. We have ruled that "[a]n instruction is proper if it is a correct statement of the law and if there is sufficient evidence offered at trial to support it." Syl. pt. 5, *Jenrett v. Smith*, 173 W.Va. 325, 315 S.E.2d 583 (1983).

In reviewing the record, we find that the trial court properly instructed the jury on Ms. Reynolds' theory of the case. Simply put, Ms. Reynolds' claim was that the Hospital negligently provided treatment to her that fell below the medical professional standard of care thus causing her injury. The trial court instructed the jury, in part, as follows:

> The plaintiff has charged the Defendants with professional negligence. In order to prevail upon this claim, the Plaintiff must prove by a preponderance of the evidence each of these three separate elements against Defendants as follows: One, a deviation from the applicable standard of care, that is negligence. Two, that such deviation from the standard of care was a proximate cause of an injury to the Plaintiff. And three, her damages.
>
> . . . .
>
> So, negligence in the context of the hospital would be the doing of an act which a reasonably prudent nurse would not do, or the omission to do an act which a reasonably prudent nurse would do.
>
> Likewise, with regard to Defendant Doctor Park, ordinary care is defined as being that kind and degree of care or caution which a reasonable prudent physician would exercise under the same or like circumstances. So, negligence in the context of Doctor Park would be the doing of an act which a reasonably prudent doctor would not do, or the omission to do an act which a reasonably prudent doctor would do.

We find no error in the trial court's refusal to instruct the jury in language that Ms. Reynolds erroneously contends stated her theory of the case.

**3. Failure to give a thin skull instruction.** Ms. Reynolds next contends that the trial court committed error by refusing her request that the jury be instructed on the thin skull or eggshell rule.[4] The Hospital and Dr. Park contend that under the decisions of this Court, the trial court properly declined to give such an instruction because neither defendant asserted that its negligence would not have injured Ms. Reynolds but for her frailty due to age. We agree with the Hospital and with Dr. Park.

The controlling cases on this issue are *Howe v. Thompson*, 186 W.Va. 214, 412 S.E.2d 212 (1991), and *Shia v. Chvasta*, 180 W.Va. 510, 377 S.E.2d 644 (1988). Both *Howe* and *Shia* were medical malpractice causes of action. In both cases, the plaintiffs requested a jury instruction on the thin skull rule. In both cases the respective trial courts refused to give such an instruction. In affirming the trial courts' ruling on the thin skull rule in *Howe* and *Shia*, this Court found that the defendants in those cases did not attempt to avoid responsibility by asserting that any negligence on their part would not have injured the plaintiffs but for some pre-existing condition. In Syllabus point 1 of *Howe* and Syllabus point 2 of *Shia* we held that:

> Even if a requested instruction is a correct statement of the law, refusal to grant such instruction is not error when the jury was fully instructed on all principles that applied to the case and the refusal of the instruction in no way impeded the offering side's closing argument or foreclosed the jury's passing on the offering side's basic theory of the case as developed through the evidence.

186 W.Va. 214, 412 S.E.2d 212, 180 W.Va. 510, 377 S.E.2d 644.

■ In the case *sub judice*, neither the Hospital nor Dr. Park presented substantive

---

**4.** A thin skull instruction states "that the defendant took the plaintiff as he found her, also known as the 'eggshell plaintiff' instruction."

*Howe v. Thompson*, 186 W.Va. 214, 217, 412 S.E.2d 212, 215 (1991).

evidence or arguments asserting that but for her age and her physically frail condition their negligence would have caused no injuries to Ms. Reynolds. Moreover, the trial court's instruction adequately informed the jury on the issue of proximate cause:

The proximate cause of an event is that cause which in actual sequence unbroken by any independent cause produces an event, and without which the event would not have occurred. *It is not necessary that the jury find that a particular defendant's negligence, if any, was the only cause of Plaintiff's injury. It is only necessary that you find by a preponderance of the evidence that such negligence was a proximate cause of the injury.*

(Emphasis added). "Therefore, it was not reversible error for the trial court to refuse to give an 'eggshell plaintiff' instruction." *Howe,* 186 W.Va. at 219, 412 S.E.2d at 217.

■ **4. Failure to instruct the jury that the Hospital did not follow its own policies and procedures.** Finally, Ms. Reynolds requested that the trial court instruct "the jury that in the event they did not find that City Hospital fell below the standard of care of the profession ..., that they might still find negligence on the part of City Hospital in the event that City Hospital violated its own policies and procedures." The trial court refused to give such an instruction. The Hospital contends that such an instruction is in conflict with the requirement that, in a medical malpractice case, negligence is determined based upon a violation of the standard of care of the profession. We agree with the Hospital for the reasons stated in *Bell v. Maricopa Med. Ctr.,* 157 Ariz. 192, 755 P.2d 1180 (Ct.App.1988):

Within their areas of expertise, health care providers and other professionals are held to a higher standard of care than that of the ordinary prudent person. In professional malpractice cases, the reasonable man standard is therefore replaced by a standard based upon the usual conduct of other members of the defendant's profession in similar circumstances. In such

cases, the plaintiff must present evidence of this accepted professional conduct to enable the jury to determine the applicable standard. The plaintiff must then establish the professional defendant's negligence by demonstrating that his conduct deviated from the standard.

. . . .

The jury cannot consider whether a medical malpractice defendant has acted negligently until it has determined the standard against which the defendant's conduct is to be measured. There is a difference between the evidence the jury considers in determining the standard and the standard itself. Only a deviation from the standard itself constitutes evidence of negligence. Consequently, the jury ... could not have found that the hospital's violation of its protocols constituted evidence of negligence unless it first found that the protocols were not merely evidence of the applicable standard, but were synonymous with it.

*Bell,* 755 P.2d at 1182–83 (citation omitted).

Ms. Reynolds sought to impose liability upon the Hospital under two standards: the standard of care of the profession and the Hospital's own protocols. We agree with *Bell* that such liability may occur, but only where the protocols are synonymous with the standard of care of the profession; not where the protocols exceed the standard of care of the profession.[5] Therefore, we find that the circuit court did not err by refusing to give Ms. Reynolds' proffered instructions.

### B. Admission Of Evidence Regarding Medicare

■ Ms. Reynolds next asserts that the trial court committed error by admitting testimony regarding her receipt of Medicare. This Court observed in Syllabus point 1, in part, of *McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995), that:

The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and pro-

---

**5.** The Hospital contends that the protocols introduced to the jury were not applicable to the facts of the case. The protocols concerned duties im-

posed when a patient is restrained. However, Ms. Reynolds was not restrained on either occasion on which she fell.

cedural rulings. Thus, rulings on the admissibility of evidence ... are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Although "most rulings of a trial court regarding the admission of evidence are reviewed under an abuse of discretion standard, ... an appellate court reviews de novo the legal analysis underlying a trial court's decision." *State v. Guthrie*, 194 W.Va. 657, 680, 461 S.E.2d 163, 186 (1995).

Initially, we note that Ms. Reynolds' brief presents this assignment of error inconsistently with the actual trial transcript. Ms. Reynolds indicates that her trial counsel was the first to introduce the issue of Medicare to the jury, through her counsel's direct examination of a witness, Harry Butterfield.[6] Our review of the transcript reveals no express testimony by Mr. Butterfield wherein he mentions Medicare on direct examination.[7] The record presented to this Court clearly reveals the issue of Medicare was referenced by Mr. Butterfield during cross-examination by Hospital's counsel:

> Counsel for the Hospital: In fact, I think, correct me if I am wrong, you hired sitters after the first fall.
>
> Mr. Butterfield: That's correct, one a day.
>
> Counsel for the Hospital: A shift during the day. Was that a 9:00 to 5:00 shift essentially?
>
> Mr. Butterfield: Yes.
>
> Counsel for the Hospital: You hired those sitters and paid for them yourself with the expectation of being reimbursed, correct?
>
> Mr. Butterfield: At that time I didn't care whether I got reimbursed or not. Ms. Reynolds needed help and I didn't have time to worry about those things. I found the girls, I hired them, and paid for it. Mr. Horning later reimbursed me, but

I didn't think one way or the other about getting reimbursed at that time.

> Counsel for the Hospital: And in fact, you looked at this situation as one in which you were making the decisions about what was going on in the hospital, and in fact much of what you were deciding or expecting from Ms. Reynolds was because the hospital was being paid, as you—stated by you, to take care of this lady?
>
> Mr. Butterfield: No, the hospital only—the hospital was only being paid to take care of Ms. Reynolds indirectly through her insurances and through the Medicare and through my taxes, so it is indirectly I'm paying for it. You're paying for it. Everybody is paying through Medicare what Ms. Reynolds was supposed to be receiving in the hospital.
>
> Counsel for the Hospital: I understand. And when you said—when you earlier said that you were offended and upset by some of the service that Ms. Reynolds was receiving and you were paying for, what you meant was generally that was being paid for, not that you were paying for it personally?
>
> Mr. Butterfield: No, I just explained that.
>
> Counsel for the Hospital: Okay, just so we're clear on that.
>
> Mr. Butterfield: I pay taxes, that goes into Medicare, and Medicare in turn pays her, so in a sense I'm paying for it. The public was paying for Ms. Reynolds' care. She also had insurance so she had to pay a deductible from Medicare and also for her own insurance. So, the part that Medicare was paying, I was paying for also. When I said, in those terms that's the terms I meant.

Ms. Reynolds' brief does not assign as error the unsolicited remarks by Mr. Butterfield concerning Medicare. We also note that during the cross-examination of Mr. Butterfield, Ms. Reynolds failed to object to the mention of Medicare. We observed in *Reed v. Wimmer*, 195 W.Va. 199, 204 n. 4,

---

6. Mr. Butterfield testified to being a close companion of Ms. Reynolds.

7. Ms. Reynolds' brief does not cite to any pages or specific testimony in the record to support her contention.

465 S.E.2d 199, 204 n. 4 (1995), that "[o]nce it is believed that evidence of a prejudicial nature has been introduced, to satisfy the requirements of Rule 103(a) an objection must be interposed at the time the evidence has been offered and the trial court thus be given an opportunity to rule on the admissibility of the evidence." In *State v. LaRock*, 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996), we expounded further:

> Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights ... When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

*See Hanlon v. Logan County Bd. of Educ.*, 201 W.Va. 305, 315, 496 S.E.2d 447, 457 (1997) ("Long standing case law and procedural requirements in this State mandate that a party must alert a tribunal as to perceived defects at the time such defects occur in order to preserve the alleged error for appeal."); *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996) ("The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace.") (citations omitted).

In the instant proceeding, we find that Ms. Reynolds waived, for appeal purposes, any objection she had to Mr. Butterfield's remarks pertaining to Medicare. Counsel failed to timely object to the testimony. Mr. Butterfield was a witness that was called by Ms. Reynolds in her case-in-chief. The questioning of Mr. Butterfield during cross-examination simply required Mr. Butterfield to state whether his money actually helped pay for Ms. Reynolds' expenses. Mr. Butterfield volunteered remarks concerning Medicare.

The issue of Medicare surfaced again during the Hospital's cross-examination of Roy A. Horning as follows: [8]

> Counsel for the Hospital: Mr. Horning, I can be very brief with you. Just as a point of clarification, Mrs. Rose (Plaintiff's Counsel) was asking you with regard to these bills that she was discussing, whether you paid these in your representative capacity. Whether these amounts were paid and those amounts were paid. The jury heard a description earlier by Mr. Butterfield that certain of these items were paid out-of-pocket, if you will, and others weren't?
>
> Mr. Horning: Yes.
>
> Counsel for the Hospital: Did you mean to say that you saw to it in whatever fashion that all of these bills and all of these expenses were satisfied in full?
>
> Mr. Horning: Well, I had to rely pretty much on Mr. Butterfield. He would send me—things that he paid out-of-pocket, he would—he would itemize and send me in the mail. And I would reimburse him for everything that he sent in. And also I have arranged with quite a few different suppliers to bill—send the bills directly to me, and I pay those directly. Like telephone bills and that sort of thing.
>
> Counsel for Ms. Reynolds: I have an objection, Your Honor, and I apologize because I didn't want to interrupt the answer. It goes to the collateral source rule, and I do know that Mr. Butterfield has already through cross-examination talked about payment from Medicare and that

---

8. Mr. Horning was listed as a plaintiff having power of attorney for Ms. Reynolds.

type of thing. But I do believe that it is inappropriate to belabor the point. And am interposing an objection at this point in terms of who paid what bills, as long as they were paid on behalf of Mrs. Reynolds. And given the rules of subrogation and the federal law that—

Counsel for the Hospital: Your Honor, Your Honor, may I please interrupt. I don't think a speech is necessary. I'm only asking for clarification as to whether the witness paid something or saw to it that it was paid. That's not belaboring the point, but speaking objection is not appropriate.

Court: With that understanding, it is overruled. Proceed, sir.

Counsel for the Hospital: Mr. Horning, I'm sorry we had to have that exchange. Again, just for clarification's sake, there were certain of these expenses, for example medical and hospital bills, which you may not have paid on Mrs. Reynolds' behalf, but you simply made sure they were paid?

Mr. Horning: Right.

We fail to understand any basis for Ms. Reynolds' argument. Ms. Reynolds' brief states that she made no objection during cross-examination. Clearly, the transcript illustrates that Ms. Reynolds did, in fact, raise an objection during Mr. Horning's cross-examination which was overruled.[9]

■ Further, Ms. Reynolds' brief states that "[t]he Appellees made·an issue of Medicare during their cross-examination of Roy Horning." Our reading of the transcript does not support Ms. Reynolds' version of Mr. Horning's cross-examination. Mr. Horning was asked whether he personally paid Ms. Reynolds' bills or whether he made sure the bills were paid on her behalf. The only mention of Medicare was made by Ms. Reynolds' counsel during an objection. Since the issue of Medicare during Mr. Horning's testi-

mony was a matter interjected at the trial through counsel for Ms. Reynolds, we find no merit in this assignment of error.[10]

### C. The Verdict Was Against The Weight Of The Evidence

■ In the final assignment of error by Ms. Reynolds, she contends that the verdict was against the weight of the evidence and that the trial court should have granted her motion for a new trial. This Court has held:

[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). We held in Syllabus point 5 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), that:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

This case turned on the credibility of the witnesses. Ms. Reynolds called two experts, Michelle Taylor, a nurse, and Dr. Gary Gibson, a physician. Nurse Taylor testified that the treatment of Ms. Reynolds fell below the standard of care. However, Dr. Gibson, Ms. Reynolds' own expert, testified that the standard of care was not violated in her treatment. The Hospital and Dr. Park also pre-

---

9. We can only assume that Ms. Reynolds' counsel did not read the transcript before making this assignment of error.

10. Ms. Reynolds contends that while she failed to timely object during Mr. Horning's testimony, the trial court still should have given her proffered curative jury instruction during the court's

general charge to the jury. Ms. Reynolds' counsel *did voice* an objection during Mr. Horning's testimony, even though Mr. Horning did not mention Medicare. As such, we find no abuse of discretion in the trial court refusing to give a curative instruction during its charge to the jury.

sented expert testimony, by Dr. John R. Ellis, Dr. Robert B. Walker and Nurse Ellen Curry, that the standard of care was not violated in treating Ms. Reynolds. The jury chose to believe Dr. Gibson and the defendants' experts on this liability issue. We find no reason to disturb the trial court's denial of Ms. Reynolds' motion for a new trial on the issue of sufficiency of the evidence.

## IV.

### CONCLUSION

We find there was no reversible error in the trial of this case. Therefore, we affirm the jury's verdict.

Affirmed.

STARCHER, Justice, dissenting:

(Filed April 21, 2000)

This Court has heard oral argument and issued written opinions in this case two times. I dissented from the majority's first opinion in this case because it was wrong. I dissent to this opinion as well because it is just as wrong.

I cannot agree with the majority opinion's discussion of the record in this case. I realize that medical treatment often does not result in a perfect outcome. Patients in hospitals get infections and broken bones do not always mend properly. But the facts in this case have nothing to do with a "bad outcome." The plaintiff in this case, Catherine Reynolds, went into the hospital with lower back pain, and her diagnosis on admission was "falling episodes;" the plan for her treatment was 3 to 5 days of testing. The plaintiff came out of the hospital a month later with a broken shoulder, a broken hip, a urinary tract infection, a loss of 20 pounds and bed sores.

At the time of her hospitalization, Mrs. Reynolds was an 86–year–old self-sufficient woman who lived alone at home, ate without assistance and went to the bathroom just like the rest of us. In January 1994 she walked into the hospital, under her own power, for a few days of testing because of lower back pain she was having that resulted from a "dizzy spell" fall. Mrs. Reynolds was carried

out of the hospital a month later on a stretcher to an ambulance that transported her back to her home where she has since been under 24–hour nursing care.

Mrs. Reynolds's attorney introduced evidence showing that the defendant doctor over-prescribed certain drugs for the plaintiff which adversely interacted with other drugs given to the plaintiff. This left the plaintiff in a dazed, heavily medicated state—so bad that one doctor decided to diagnose the plaintiff with "dementia." Then the hospital failed to follow its own policies concerning the restraint of such dazed patients, and neglected to ensure that the facility was adequately staffed with enough personnel who could tend to the plaintiff's basic needs. The result was that Mrs. Reynolds, who was left sitting in her own feces and urine, tried to get out of bed under her own power. The first time she tried she fell and broke her shoulder. The second time she tried she fell and broke her hip.

When the hospital did take the time to tie Mrs. Reynolds to her bed, it catheterized her and left the catheter in for long periods, resulting in a urinary tract infection. The plaintiff was unable to feed herself, and lost 20 pounds during her month in the hospital. The plaintiff was given a "call" button so she could page a nurse for assistance—but the button was attached to the bed above the plaintiff's immobilized broken shoulder, out of her reach, so that it was unusable. Incredibly, the whole time that this "treatment" was occurring, the hospital failed to diagnose the fractured lumbar vertebrae that was causing the plaintiff's lower back pain.

The majority opinion examines this case as a dry legal dispute of whether the plaintiff proved by a preponderance of the evidence that the defendants deviated from the standard of care. The interests of justice rise above a mere statement of the law. It's patently obvious that Mrs. Reynolds didn't get proper treatment from the defendants, and in this lawsuit, did not get justice.

The plaintiff, in my reading of the record, *did* prove that the defendants deviated from the standard of care. The attorney representing the defendant hospital conceded to

the jury during closing argument that even he thought Mrs. Reynolds received "unacceptable" care.

But the circuit court repeatedly constrained the plaintiff's attorney from fully representing Mrs. Reynolds. The defendants based their entire case on the argument that the average person would not have been injured by their negligence, and that Mrs. Reynolds' injuries occurred because of her frailty due to her age. This is a classic "thin skull" or "eggshell plaintiff" case, and the circuit court should have allowed the plaintiff to argue that even though Mrs. Reynolds was aged, she was still entitled to quality care. It is a basic principle of law that a defendant takes a plaintiff as he finds her. *See, e.g., Howe v. Thompson,* 186 W.Va. 214, 217, 412 S.E.2d 212, 215 (1991). Because Mrs. Reynolds was frail, the defendants should have exercised greater caution in her care; because they failed to exercise even basic caution, the defendants should have been held liable to Mrs. Reynolds for the pain, suffering and humiliation inflicted upon her.

Unfortunately, the repeated mistakes committed by the hospital in this case appear to be a routine occurrence when patients are hospitalized. A recent, frightening report by the Institute of Medicine found, based upon studies of medical errors committed in Colorado and Utah hospitals, that an "adverse event" occurred in 2.9 out of every 100 hospitalizations. A similar study of New York hospitals found an "adverse event" in 3.7 out of every 100 hospitalizations. In the Colorado and Utah study, 8.8% of the adverse events resulted in death to the patient, compared with 13.6% in the New York study. The Institute of Medicine found that:

> In both of these studies, over half of these adverse events resulted from medical errors and could have been prevented.
>
> When extrapolated to the over 33.6 million admissions to U.S. hospitals in 1997, the results of the study in Colorado and Utah imply that at least 44,000 Americans die each year as a result of medical errors.

The results of the New York study suggest the number may be as high as 98,000. Even when using the lower estimate, deaths due to medical errors exceed the number attributable to the 8th leading cause of death. More people die as a result of medical errors than from motor vehicle accidents (43,458), breast cancer (42,297) or AIDS (15,516)....

Every year, over 6,000 Americans die from workplace injuries. Medication errors alone ... are estimated to account for over 7,000 deaths annually.

Linda T. Kohn, *et al., To Err is Human: Building a Safer Health System,* p. 1 (National Academy Press, 1999).

As citizens, we insist on safety in our everyday lives. Take, for example, the risk of flying in an airplane. Until World War II, airplane accidents were viewed primarily as individually caused, and safety meant telling pilots to "be safe." In the years after the war, airlines, plane manufacturers and the government took a comprehensive approach to safety. Every aspect of civilian aviation was studied, accidents were thoroughly examined, and potentially dangerous situations were reported. In sum, everyone learned from their mistakes. The result was better planes, better pilots and a safer aviation industry for everyone. Between 1967 and 1976, the risk of dying in a domestic jet flight was 1 in 2 million; by the 1990s, the risk had declined to 1 in 8 million. "Using the 1996 fatal accident rate, statistically a passenger would have to fly around the clock for over 438 years before being involved in a fatal crash." *See* "The Aviation Safety System," Aviation Safety Information from the Federal Aviation Administration, *www.faa.gov/publicinfo.htm.*

Another example of improving safety may be found at work. As a result of recognizing and acknowledging workplace mistakes, and removing unsafe conditions and practices, the American workplace has become considerably safer. State and federal occupational safety and health agencies research working conditions, develop and enforce standards for

job health and safety and maintain a system where workplace mistakes are reported, recorded, and studied. The result is that, while U.S. employment has nearly doubled since 1971, the number of workplace fatalities has been cut in half and injury and illness rates have dropped by 40 percent.[1]

Conversely, the health care industry is far behind other industries in improving its safety record. The Institute of Medicine states that *"safety is defined as freedom from accidental injury." To Err is Human, supra* at 49. After carefully examining how hospitals, doctors and other people in the field of medicine practice their trade, the Institute concluded that "the delivery of health care services may be classified as an industry prone to accidents." In light of the damage that was inflicted on Mrs. Reynolds during her hospital stay, this finding is an understatement.

The Court cannot, should not, sanction the kind of "care" that Mrs. Reynolds received from the defendants. She was repeatedly subjected to all-to-common mistakes which had a devastating accumulated effect. The defendants should have been held liable for the humiliation, suffering and pain they inflicted upon this elderly lady. I therefore respectfully dissent a second time.

I am authorized to state that Justice McGRAW joins in this opinion.

---

1. A brochure issued by the U.S. Occupational Safety and Health Administration states:

    OSHA's mission is to send every worker home whole and healthy every day. Since Congress created the agency in 1971, workplace fatalities have been cut in half and occupational injury and illness rates have declined 40 percent. At the same time, U.S. employment has nearly doubled from 56 million workers at nearly 3.5 million worksites to 105 million workers at nearly 6.9 million sites. "OSHA Facts: New Ways of Working," OSHA Vital Facts, Occupational Safety and Health Administration, Department of Labor, *www.osha-slc.gov/OSHAFacts/OSHAFacts.html.* The same brochure states that there were 6,026 worker fatalities in 1998, "212 fewer than in 1997—a 3–percent decline in deaths."