**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1606**

VERONICA DRENNEN; BOBBY DRENNEN, her husband,

Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee,

and

COMMUNITY HEALTH SYSTEMS, INCORPORATED; ROY WOLFE, JR., M.D.,

Defendants.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.   Thomas E. Johnston, District Judge. (5:06-cv-00390)

Argued: March 24, 2010

Decided: April 22, 2010

Before NIEMEYER and MOTZ, Circuit Judges, and James A. BEATY, Jr., Chief United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Thomas Fiorino Basile, THOMAS F. BASILE, ESQ., Charleston, West Virginia, for Appellants.   Stephen Michael Horn, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West

Virginia, for Appellee. **ON BRIEF:** Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After a bench trial, the district court found in favor of the United States in this Federal Tort Claims Act ("FTCA") medical malpractice action. Veronica Drennen and her husband, Bobby Drennen, appeal. They challenge the district court's factual findings, evidentiary rulings, and legal conclusions. For the reasons that follow, we affirm.

I.

Veronica Drennen suffered from a cystocele, a condition where the fascia (soft tissue) between the bladder and the vagina degrades such that the bladder bulges into the vagina. On December 18, 2001, Dr. Roy Wolfe performed surgery, not relevant here, to treat the problem. This surgery afforded Drennen temporary relief, but twenty months later, in August of 2003, she again complained of pain. She returned to Dr. Wolfe, who concluded that her cystocele had recurred.

On October 21, 2003, Dr. Wolfe performed an operation called anterior colporrhaphy. In this surgery, a doctor holds open the vagina with a speculum and looks in to locate the cystocele. He then cuts the anterior vaginal wall to reveal the fascia and uses sutures to pull together and reinforce strong fascia before closing the vaginal wall. It is undisputed that the surgery performed on Drennen followed this procedure.

3

On October 27, 2003, a week after her surgery, Drennen called Dr. Wolfe's office complaining of pain and requesting medication, which she received. She called again on November 4. Dr. Wolfe ordered a renal ultrasound, which revealed "gross hydronephrosis," meaning that Drennen's kidney was swollen and her ureters were likely obstructed.

Dr. Wolfe referred Drennen to Dr. Apolonio Lirio, who noted in his operative report that Drennen's ureter was deviated, which suggested swelling. Dr. Lirio also noted that the ureter was obstructed to the point where he could not pass a sensor wire through it to determine the location of the blockage.

The next day, Drennen went to West Virginia University Hospital for further treatment. First, Dr. Stanley Zaslau, a urologist, attempted to correct Drennen's ureteral blockage using a stent. That attempt failed, leaving surgery as the only option. To allow Drennen's kidney to drain in the weeks prior to surgery, Dr. Patricia Stoltzfus placed a tube into the kidney to release the excess fluid from it into a bag. Dr. Stoltzfus noted that Drennen's ureter inserted ectopically (in the wrong place) into the bladder.

On January 20, 2004, Dr. Zaslau performed ureteral reimplantation surgery, which consists of cutting the ureter near the obstruction and then re-inserting it into the bladder,

4

effectively bypassing the blockage. That surgery solved Drennen's problem.

Drennen believes that during the anterior colporrhaphy Dr. Wolfe stitched through or near her ureter, causing the obstruction. She and her husband brought this action alleging medical malpractice against Dr. Wolfe and his employer. Dr. Wolfe falls within the statutory definition of a "Public Health Service employee" under the FTCA, and the United States thus stands as the defendant in this action. See 42 U.S.C. § 233(g) (2006).

Under the FTCA, West Virginia law governs this action. In West Virginia, the Medical Professional Liability Act ("MPLA") controls medical malpractice claims. The MPLA provides that in order to bring such a claim, a plaintiff must prove that:

> (a) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

> (b) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-3.

Additionally, thirty days before filing a complaint, West Virginia law requires a claimant to:

> serve by certified mail . . . a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a

5

statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit.

W. Va. Code § 55-7B-6(b). In her notice of claim, Drennen stated that:

Roy Wolfe, Jr., M.D. . . . negligently failed to perform a routine cystoscopy after performing an anterior colporrhaphy on Veronica Drennen. This negligence caused Dr. Wolfe to fail to notice that he had negligently stitched Mrs. Drennen's left ureter closed, creating an obstruction for the left kidney. Mrs. Drennen was unable to pass urine from 10/21/03 thru 11/06/03, developed sepsis and nearly died.[1]

Drennen's "screening certificate of merit" included an expert opinion from Dr. Zaslau, who performed her ureteral reimplantation surgery, stating that Dr. Wolfe's failure to perform a "routine cystoscopy" during the anterior colporrhaphy breached the standard of care, and that this breach caused Drennen's injuries.

Drennen's complaint advanced two theories of liability: (1) that Dr. Wolfe had stitched in a negligent manner causing an obstruction to Drennen's ureter; and (2) that Dr. Wolfe had

---

[1] Cystoscopy is an invasive diagnostic procedure in which a doctor inserts a cystoscope -- a tube with a lens at the end of it -- into a patient's urethra, and looks through the tube to examine the bladder. When using cystoscopy to examine ureters, the doctor injects blue dye into the bloodstream. The kidneys remove the dye from the blood and the dye travels down the ureters and into the bladder. If dye fails to emerge into the bladder from a ureteral orifice, then the doctor can infer that the corresponding ureter is obstructed.

6

negligently failed to perform a cystoscopy to check for ureteral obstruction.

After discovery, including depositions of the relevant experts, the Government moved for summary judgment. Although the district court denied that motion, the court noted that Dr. Zaslau had admitted in deposition that the standard of care did not require a surgeon to perform a cystoscopy during anterior repair surgery, and the court thus prohibited Drennen from asserting that theory at trial. The district court thus directed Drennen to proceed on two modified theories: (1) that Dr. Wolfe had stitched in a negligent manner, causing an obstruction to her ureter; and (2) that Dr. Wolfe had negligently failed to do some additional diagnostic procedure (not necessarily cystoscopy) during the anterior repair surgery to check whether Drennen's ureters were obstructed.

The district court held a one-day bench trial, in which Dr. Zaslau testified as the sole expert witness for Drennen regarding both the "negligent stitch" theory of liability and the "failure to check" theory. For each theory, Dr. Zaslau discussed the standard of care and causation. Dr. Wolfe testified as the treating physician, and the Government introduced the deposition testimony of its expert, urologist Dr. Karen Ashby.

With regard to the "negligent stitch" theory, the district court found that Drennen had failed to establish that a misplaced stitch, standing alone, breached an applicable standard of care. The court also found that Drennen had failed to establish that a surgical stitch caused her ureteral obstruction.

With regard to the "failure to check" theory, the court found that the standard of care did not require physicians to perform an invasive diagnostic procedure to evaluate the ureters during an anterior repair surgery. The evidence at trial established two ways to examine a ureter: cystoscopy or intravenous pyelogram ("IVP").[2] The court relied on its pre-trial ruling that cystoscopy did not constitute the national standard of care. Moreover, the court held that Drennen could not prevail on the theory that IVP was the national standard of care because she had not mentioned IVP in her pre-trial notice of claim, and alternatively because no expert had testified that the national standard of care required a doctor to perform an IVP in these circumstances.

---

[2] IVP is a more involved diagnostic procedure than cystoscopy. In IVP, a radiologist injects contrast material into the patient's veins. Eventually, the contrast travels through the bloodstream and into the kidneys, down the ureters, and into the bladder. Using x-rays, the radiologist can observe whether the contrast encounters a blockage.

For these reasons, the district court granted judgment to the United States.  After Drennen moved unsuccessfully for a new trial, she timely noted this appeal.

Drennen raises three contentions on appeal.  First, she argues that the district court did not give sufficient weight to Dr. Zaslau's expert testimony, and thus erred in its factual findings.  Second, she maintains that the district court made two evidentiary errors: admitting the testimony of Dr. Wolfe as an expert and excluding an alleged statement against interest made by Dr. Resley, Dr. Wolfe's partner in his medical practice.  Third, she challenges the district court's holding regarding her IVP argument.  We consider each contention in turn.

## II.

In West Virginia, as in most states, the plaintiff in a medical malpractice action bears the burden of proving that the treating physician violated the national standard of care.[3]  This means that "the reasonable man standard is . . . replaced by a standard based upon the usual conduct of other members of the defendant's profession in similar circumstances."  Reynolds v. City Hosp., Inc., 529 S.E.2d 341, 348 (W. Va. 2000) (quoting

---

[3]  West Virginia has abolished the "locality rule," which means that courts must determine the standard of care by reference to national standards.  Paintiff v. City of Parkersburg, 345 S.E.2d 564, 567 (W. Va. 1986).

9

Bell v. Maricopa Med. Ctr., 755 P.2d 1180, 1182 (Ariz. Ct. App. 1988)). To comply with this standard, "a physician or other medical practitioner is not required to exercise the highest degree of skill and diligence possible." Schroeder v. Adkins, 141 S.E.2d 352, 357 (W. Va. 1965). Rather, "he is required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing." Id.

The plaintiff must establish, through the use of expert testimony, both the standard of care and that the treating physician's actions breached that standard. W. Va. Code § 55-7B-7(a). Finally, the plaintiff must prove that the breach was the proximate cause of the injuries suffered.

Determinations about both the standard of care and causation constitute findings of fact. See Mays v. Chang, 579 S.E.2d 561, 565 (W. Va. 2003). After a bench trial, we review such findings for clear error. Ellis v. Grant Thornton LLP, 530 F.3d 280, 286-87 (4th Cir. 2008); Fed. R. Civ. P. 52(a)(6). Factual findings will be overturned only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Ellis, 530 F.3d at 287 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). In considering the evidence, we must give due regard to the trial court's ability to judge the

10

credibility of witnesses. Fed. R. Civ. P. 52(a)(6). With these principles in mind, we examine each of the district court's challenged factual findings.

## A.

The district court found that a doctor's placement of a stitch through a ureter, in and of itself, does not violate the standard of care. The record offers strong support for this finding. Drennen's own expert, Dr. Zaslau, although opining that negligence arises when a physician fails to perform an invasive diagnostic procedure to check whether he stitched incorrectly, conceded that an errant stitch, standing alone, does not breach any applicable standard of care.

## B.

With regard to causation, the district court found that Drennen had not established, by a preponderance of the evidence, that a stitch had obstructed her ureter. Again, the testimony of Drennen's own expert supports this finding, as Dr. Zaslau acknowledged that he had not personally seen a stitch in Drennen's ureter. Instead, he opined that the other possible causes of a blockage to the ureter -- edema (swelling), a congenital stricture, and kidney stones -- were relatively unlikely. Dr. Zaslau also asserted that, although Dr. Stoltzfus had noted that Drennen's ureter inserted ectopically, Dr. Zaslau considered that possibility unlikely.

The district court found Dr. Zaslau's process-of-elimination rationale unpersuasive. The court found that edema could have caused the blockage, and that an ectopically inserted ureter might also have caused the problem. It also found Dr. Zaslau's testimony not entirely credible because the doctor had not voiced any concerns about a surgical stitch until after Drennen had retained him as an expert witness. The district court found that this shift in Dr. Zaslau's views "cast a shadow of doubt on the objectivity of his reports," and thus diminished the weight of his testimony.

Drennen argues that Dr. Zaslau was the only expert who testified as to causation, and therefore the district court clearly erred in rejecting Dr. Zaslau's testimony. This argument fails. Drennen cites no rule of law requiring a finder of fact to accept the testimony of an expert witness, especially when it finds that witness's testimony inconsistent and his credibility impaired. Indeed, it seems axiomatic that when a district court acts as a fact-finder it, like a jury, may accept all, part, or none of a paid expert's opinion. See 9C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2586 (3d ed. 2004) ("The court need not accept even uncontradicted and unimpeached testimony if it is from an interested party or is inherently improbable.").

12

Furthermore, Drennen points to no hard evidence that corroborates Dr. Zaslau's testimony. Dr. Zaslau himself conceded that he did not see any stitch, but rather concluded that a stitch probably caused Drennen's blockage because, in his opinion, other causes were unlikely. To be sure, Dr. Zaslau's testimony appears methodical and thorough. But absent some concrete proof, Dr. Zaslau's reasoning is only as persuasive as the district court -- which had an opportunity to observe Dr. Zaslau and weigh his demeanor and credibility -- found it to be. Because we are not "left with the definite and firm conviction that a mistake has been committed," we cannot disturb the judgment of the district court. Ellis, 530 F.3d at 287.

C.

Finally, we see no error in the district court's findings as to the standard of care relating to the "failure to check" theory. Dr. Zaslau conceded in his deposition that the risk of an injury to the ureter in anterior repair surgery was low,[4] but stated that in his opinion, a prudent physician would still perform some ancillary diagnostic procedure. Dr. Zaslau testified that there were two procedures that a physician might

---

[4] Dr. Zaslau cited a study stating that in a broad array of vaginal surgeries, including anterior repairs, the total injury rate was 8.8 out of 1000, or 0.88%. He first characterized this as a high number, but then backtracked and stated that the "incidents of these renal injuries is low."

13

use: cystoscopy and IVP.[5]  He admitted, however, that cystoscopy had not yet been adopted as the standard of care.

Dr. Zaslau testified inconsistently on the question of whether the standard of care required IVP in lieu of cystoscopy. At one point, he stated that it would be negligent to do neither cystoscopy nor IVP.  However, moments later, Dr. Zaslau agreed that it was "a fair statement" that "there is really only one good way to check, and that's using cystoscopy."  Of course, he had already conceded that the standard of care did not require cystoscopy.

Dr. Ashby and Dr. Wolfe, on the other hand, both unequivocally testified that the risk of obstructing a ureter during anterior repair surgery was sufficiently low that a prudent physician would not perform any invasive diagnostic procedure.  These experts stated that the standard of care required the physician to perform the surgery carefully, but did not require cystoscopy or IVP.  The district court credited

---

[5] On appeal, Drennen suggests that a surgeon could use methods other than cystoscopy and IVP to check for ureteral obstruction.  She discusses antegrade and retrograde pyelograms (which may or may not be the same as an intravenous pyelogram (IVP)), dye tests (which require cystoscopy in order to be effective), and the use of balloon catheters and sensor wires. However, to the extent that these methods differ from cystoscopy or IVP, no witness (or lawyer) advocated any of them before the district court.  In fact, the experts specifically testified that cystoscopy and IVP were the only plausible ways to perform an intraoperative diagnosis for ureteral obstruction.

14

their views, noting that while cystoscopy might become the standard of care in the future, currently that is not the case.

"Evaluating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer. An appellate court should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony." Hendricks v. Cent. Reserve Life Ins. Co., 39 F.3d 507, 513 (4th Cir. 1994). Given the conflict in the expert testimony and the inconsistencies in Dr. Zaslau's testimony, we cannot say that the district court's decision to credit the testimony of Dr. Wolfe and Dr. Ashby constituted clear error.[6]

III.

Drennen challenges two of the district court's evidentiary rulings. We review these rulings "under the deferential abuse

---

[6] Drennen argues that the district court erred by treating Dr. Wolfe as an expert. We address this argument below in section III. But we note here that even if Dr. Wolfe should not have been regarded as an expert, the principal effect of excluding his testimony regarding the standard of care would be to ignore his statement that the standard of care does not require IVP. This exclusion would not aid Drennen. Because she did not present any evidence that the standard of care does require IVP, she still would have failed to carry her burden of proof. Furthermore, Dr. Ashby, whose status as an expert is undisputed, stated that the standard of care does not require an IVP, or any other additional diagnostic test.

15

of discretion standard."  United States v. Rooks, 596 F.3d 204, 209-10 (4th Cir. 2010).

First, Drennen argues that the district court improperly admitted Dr. Wolfe as an expert in this case.  Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose the identities of expert witnesses in advance of trial.  Rule 26(a)(2)(B) provides that, unless a court orders otherwise, when "the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," such disclosures "must be accompanied by a written report" setting forth the relevant details of the witness's testimony.

In this case, the district court noted that the Government identified Dr. Wolfe as an expert, but it did not submit a written report regarding his testimony.  The court nevertheless admitted Dr. Wolfe's testimony on the ground that treating physicians like Dr. Wolfe are exempt from Rule 26's written report requirement because treating physicians are not "retained or specially employed to provide expert testimony."

The district court did not abuse its discretion in so holding.  As a treating physician, Dr. Wolfe was not retained or specially employed to provide expert testimony in this case.  The note accompanying the 1993 amendments to Rule 26 confirms that this is the proper interpretation of Rule 26.  It states:

16

> The requirement of a written report in paragraph (2)(B) . . . applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. <u>A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.</u>

Fed. R. Civ. P. 26(a)(2) advisory committee's note (emphasis added). The district court thus properly relied on Dr. Wolfe's testimony as an expert opinion.[7]

Second, Drennen contends that the district court erroneously refused to consider an alleged "statement against interest" by Dr. Wolfe's partner, Dr. Resley. Dr. Resley testified that Dr. Wolfe "may have said something to the effect of we got -- I got a ureter during this case. I don't really remember, but, yes, you know, the assumption would have been that this was related to the surgery."

Dr. Resley also stated, "Dr. Wolfe assumed that it was related to the surgery at the time. Now, whether it was a direct injury to the ureter or whether it was something that had

---

[7] Drennen argues that the district court acted inconsistently because it permitted Dr. Wolfe to testify as an expert, but it refused at trial to admit the testimony of Dr. Resley. The difficulty with this argument is that Dr. Wolfe and Dr. Resley are not similarly situated. In fact, during the colloquy in which Drennen's trial counsel successfully objected to Dr. Resley answering questions about the standard of care, he conceded that "this line of questioning is certainly appropriate for Dr. Wolfe, who actually did the cystocele repair . . . ."

17

occurred during the healing process or whether it was a kinking, he didn't indicate.  I certainly don't know."

On appeal, Drennen reiterates her argument to the district court that Dr. Resley's reporting of Dr. Wolfe's statement that he "got a ureter" was an admission of liability.  Drennen emphasizes that Rule 804(b) creates an exception to the hearsay rule for admissions against interest, and argues that the district court therefore erred in refusing to consider this testimony.

This argument fails.  Drennen objects to a ruling that the district court never made, as the court never excluded Dr. Resley's testimony on the ground that it was hearsay.  Rather, the court explicitly evaluated Dr. Resley's testimony and found his statement susceptible to different interpretations.  We agree with that assessment.  To "get" a ureter could mean, as Drennen contends, that Dr. Wolfe conceded that he inadvertently stitched through the ureter, but it could also mean, as the district court held, that Dr. Wolfe only stated that Drennen "got" a ureter problem after her surgery, without any opinion as to the cause of the problem.  Taken in context, the latter meaning seems just as likely as the former, and the district court did not abuse its discretion in so finding.

Furthermore, even if we accept Drennen's characterization of Dr. Resley's statement, she still has not demonstrated

18

reversible error.  Taken at face value, Drennen's argument is that when she came to see Dr. Wolfe two weeks after her surgery, complaining of pain consistent with a ureteral obstruction, he expressed concern that he had obstructed a ureter.  That statement may prove that Dr. Wolfe was anxious that he might have obstructed a ureter, but it certainly does not prove that he actually did obstruct a ureter.  When weighed alongside the other evidence, Dr. Wolfe's assumption that Drennen's injuries might have been related to the surgery is simply not sufficiently probative to warrant reversal.

IV.

Finally, Drennen argues that the district court erred by refusing to consider her IVP theory.  The district court held that under governing West Virginia law, Drennen was required to outline this theory in her pre-trial notice of claim, but had failed to do so, focusing instead on cystoscopy to the exclusion of IVP or any other diagnostic test.  The court held, in the alternative, that "[e]ven if Plaintiffs had complied with the notice requirements . . . the testimony elicited at trial does not establish IVP as the national standard of care."

We need not reach Drennen's statutory interpretation argument because even if the district court was bound to consider her IVP theory, it did not err in concluding that

19

Drennen had failed to offer evidence that the national standard of care requires a surgeon to perform an IVP during an anterior repair. West Virginia medical malpractice law places the burden on the plaintiff to come forth with expert testimony to substantiate her claim. See W. Va. Code § 55-7B-7(a); Farley v. Shook, 629 S.E.2d 739, 744 (W. Va. 2006); Roberts v. Gale, 139 S.E.2d 272, 276 (W. Va. 1964). As the district court explained, no expert testified that the standard of care requires a physician to employ an IVP here. In fact, two experts, Dr. Wolfe and Dr. Ashby, explicitly testified to the contrary. Thus, even assuming that Drennen properly complied with the notice requirements of the MPLA, she cannot demonstrate that the national standard of care requires a physician to perform an intraoperative IVP in the circumstances of this case.

V.

The judgment of the district court is

AFFIRMED.

20