# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Brian L.,**
**Respondent Below/Petitioner**

**vs)  No. 14-1155**  (Cabell County 13-D-886)

**Heather E.,**
**Petitioner Below/Respondent**

**FILED**

November 6, 2015

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner and respondent below, Brian L. ("Father"), by counsel John A. Proctor, appeals orders entered on April 23, 2014, and October 22, 2014, in the Circuit Court of Cabell County. Respondent and petitioner below, Heather L. ("Mother"), by counsel Arik C. Paraschos and Noel M. Olivero, filed a response. Father filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Father and Mother are the parents of C.L., born February 10, 2012, in Wise, Virginia, where the couple was then living. They never married. Several weeks after C.L.'s birth, the couple ceased living together on a consistent basis. Mother and C.L moved to Kentucky where they lived from September to November 2012 at a hotel that Mother's sister managed.[1] On December 10, 2012, C.L. relocated with Mother to Cabell County, West Virginia, where they have lived continuously with Mother's husband and older son from a previous relationship. Meanwhile, Father, who is unmarried, moved to Texas in July 2012, where he has permanently resided ever since.[2]

While Mother and C.L. were living in Kentucky, Father visited C.L. there approximately two times and, in September or October 2012, he took C.L. with him to Texas for a short visit. Father returned C.L. to Kentucky on or about October 12, 2012.

---

[1] Mother never established permanent residency in Kentucky.

[2] Father's grandmother and an older son by a previous relationship both live with him in Texas.

1

On November 26, 2012, Father filed a "Petition to Adjudicate Parentage" in Harris County, Texas, in which, inter alia, he sought custody of C.L.[3] Father's petition falsely represented that C.L. was a resident of Harris County, Texas.

The parties arranged a meeting on December 30, 2012, at a hotel in Barboursville, West Virginia, as Father and his grandmother were traveling back to Texas from Ohio after the holidays. The Family Court of Cabell County found that, although Father wished to take C.L. with him to Texas for an extended stay, Mother would not agree; rather, Mother offered to let Father visit with C.L. at the hotel for about an hour. Mother left the hotel at approximately 11:00 p.m., at which time Father and his grandmother departed the hotel and took the child to Texas. Although Father contends that he took C.L. to Texas with Mother's permission, Mother disagrees; furthermore, Father's grandmother testified that when Mother left the hotel, Mother told them that she would be back in an hour to get C.L. Father refused to return C.L. to Mother.[4]

On January 8, 2013, Mother, pro se, filed a Domestic Violence Petition for Temporary Emergency Protective Order ("TEPO") against Father in the Magistrate Court of Cabell County, in response to Father taking the child to Texas without her consent.[5]

Also in January of 2013, Mother filed a custody petition in Wise County, Virginia. At that time, C.L.'s most significant period of residency had been in Virginia. From February through May 2013, multiple hearings were conducted in Wise County's Juvenile and Domestic Relations Court, in which both parties were represented by counsel.

Given that there were custody petitions pending in both Texas and Virginia, the judges of those courts consulted with one another to determine which court would assume jurisdiction over the matter. As evidenced by a March 1, 2013, letter between the two judges, it was ultimately determined that Virginia would make the initial determination of custody. Father challenged the issue of Virginia's jurisdiction over these proceedings in the Circuit Court of Wise County; his appeal was dismissed by order entered March 27, 2013, and the matter was remanded to the juvenile and domestic relations court. The Texas case was thereafter dismissed by order entered July 18, 2013.

On May 16, 2013, the parties, represented by counsel, entered into an agreed final order in Wise County, in which it was agreed that they would have joint legal and physical custody of

---

[3] Mother was served with this petition by publication in February 2013.

[4] Mother contacted local and State police, who, in turn, contacted the local Texas police, who checked on C.L. at Father's residence and determined that C.L. was not endangered. No further legal action was taken against Father. As against Mother, a misdemeanor charge of false reporting an emergency incident was filed against her in West Virginia. The charge was later dismissed, refiled, and appears to have remained unresolved.

[5] Though the magistrate court granted the petition, the order was vacated on January 10, 2013, by the family court of Cabell County because Mother filed the wrong pleading. Mother did not learn that the order was vacated until sometime in August 2013.

C.L.; that Mother would have physical custody of C.L. for a period of six weeks, beginning May 19, 2013; that if Father failed to return C.L. (who was still in Texas following the December 30, 2012, taking from the Barboursville hotel) on May 19, 2013, Mother would be given sole legal and physical custody; and that beginning July 2013, they would alternate physical custody on a month by month basis. The order further ordered that all future custody matters shall be transferred to the appropriate West Virginia court, so long as Mother continues to reside in West Virginia. Father did not appeal this agreed final order.

Thereafter, on June 17, 2013, Father, by counsel, filed a motion to dismiss the TEPO[6] for lack of jurisdiction in the Family Court of Cabell County, arguing, inter alia, that C.L. has been living in Harris County, Texas, for more than 6 months and, thus, under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") the Texas courts have proper jurisdiction to adjudicate any matters regarding C.L.; that C.L. has not been in Cabell County long enough for it to assume jurisdiction over him; and that Mother has been "forum shopping" so as to avoid any appearance in Texas. Father requested that the family court dismiss the case for lack of jurisdiction under the UCCJEA and remand the case back to Texas to resume custody proceedings there.

Mother, by counsel, filed a response to the motion to dismiss and a "Petition to Take Jurisdiction Pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, W.Va. Code 49-20-101, et seq., and a Notice of Registration of Out-of-State Custody Decree." The family court held a hearing on August 6, 2013. A full evidentiary hearing on the jurisdictional issue was conducted on September 17, 2013.

After the September 17, 2013, hearing, Father returned to Texas and filed petitions to modify parent-child relationship (i.e., a motion to modify the agreed final order entered in Virginia) and for a temporary restraining order against Mother. A TRO was entered on September 30, 2013, which ordered that Mother be immediately restrained from, inter alia, removing the child from Father's possession and beyond the jurisdiction of the Texas court.[7]

In response to Father's Texas petition, Mother, by counsel, filed an "Emergency Ex Parte Petition" in the Family Court of Cabell County to grant her full custody of C.L. until the jurisdictional matters in this case are resolved. The family court granted Mother's motion by order entered October 18, 2013, finding that a judicial proceeding occurred in Texas on September 30, 2013, while a pending case under the UCCJEA was ongoing in West Virginia; that the Texas order indicates that C.L. could be removed from West Virginia, which the family court found to be inappropriate; that it appears that the Texas court issued its order because it

_____

[6] *See* n.5, indicating that the TEPO had been vacated back in January 2013, unbeknownst to Mother and, apparently, also to Father.

[7] Despite this order, Father returned C.L to Mother for her custodial turn, as provided for in the Virginia agreed order.

3

was not informed of the proceedings in West Virginia;[8] that Father took advantage of and abused the judicial process in Texas; that the Texas order could be used to forcibly remove C.L. from the jurisdiction of West Virginia; and that no other State order other than an order from West Virginia will be honored with regard to C.L. until the outstanding jurisdictional matters are addressed.[9]

On November 1, 2013, the family court entered an "Order Regarding Jurisdiction," in which it concluded, inter alia, that the agreed final order regarding custody entered in Virginia is entitled to full faith and credit and that it transfers jurisdiction to West Virginia. Following the requirements of the UCCJEA and *In Re K.R. and P.R.*, 229 W.Va. 733, 735 S.E.2d 882 (2012), regarding whether West Virginia could assume jurisdiction over the child custody proceedings in this matter, the family court addressed, in order, whether West Virginia has (1) home state jurisdiction; (2) significant connection jurisdiction, (3) jurisdiction because of declination of jurisdiction; or (4) default jurisdiction.

The family court first determined that neither Virginia, Texas, nor West Virginia could be considered C.L.'s home state for purposes of the UCCJEA. The court found that C.L. had been absent too long from Virginia and, although he lived for over four months in Texas in 2013, that time was not applicable because Father "absconded with the child, fleeing during the night from what was intended to be a visitation in West Virginia." Since entry of the agreed order in Virginia, C.L has spent one month at a time in Texas and West Virginia. Thus, the family court found, neither state could be considered C.L.'s home state for purposes of the UCCJEA.

Ultimately, the family court found that although C.L. has significant connections in both Texas and West Virginia, the agreed order entered in Virginia provided that the parties had previously agreed to use West Virginia for future custodial issues. The court concluded that "West Virginia would have significant connection jurisdiction, if Virginia should decline jurisdiction of future custodial proceedings."

As for "declination jurisdiction," the family court determined that "the question of jurisdiction was between Texas and Virginia; that "[a]fter consultation, Texas declined to take jurisdiction;" that Virginia took jurisdiction "and the case proceeded to an Agreed Final Order[;]" and that although "Virginia has not declined jurisdiction, its May 2013 did accept the parties' agreement to transfer custodial jurisdiction to West Virginia, as long as [Mother]

---

[8] Father represents that "[a] perusal of the Texas transcript could have easily disabused the family court" of the belief that Father failed to inform the Texas court of the UCCJEA proceedings in West Virginia. However, the appendix record herein does not include a copy of the Texas transcripts.

[9] In his answer to the emergency ex parte petition, Father denied that the purpose of filing the petitions for a temporary restraining order and to modify the parent child relationship in Texas was to seek custody of C.L. Rather, he argued that the purpose of the Texas petition was "just to prove that Texas does have interest in obtaining jurisdiction over [C.L.] against [Mother's] claims that Texas has absolutely no interest in obtaining jurisdiction over the child."

4

continues to reside there.[10] The West Virginia family court should confer with the Virginia Court regarding their current intent."[11] (Footnotes added). Following entry of the family court's November 1, 2013, order, and a conference call between family court Judge Keller and Judge Hamilton in Virginia, it was determined that Virginia would decline jurisdiction in this case, a fact memorialized in a letter from Judge Keller to Judge Hamilton dated December 2, 2013. Copies were sent to the parties and to the Texas court.

Thereafter, on January 16, 2014, the family court entered an "Order Exercising Jurisdiction Pursuant to the Uniform Child Custody Jurisdiction Act, WV Code 48-20-101 et seq.," in which it concluded that, given that Virginia declined jurisdiction to West Virginia, West Virginia meets the requirements to assume jurisdiction of the custodial issues regarding C.L. [12] The Circuit Court of Cabell County affirmed the family court's order by order entered April 23, 2014.

On June 24, 2014, the family court conducted a hearing on the ex parte order previously entered on October 18, 2013, as well as on Mother's petition for child support and for attorney's fees. By order entered July 29, 2014, the family court ordered, inter alia, that the October 18, 2013, emergency ex parte order shall remain in full force and effect; that Father will have no contact with C.L. while the outstanding action in Texas continues "since he is a flight risk with the child[;]" that Father will pay a set amount of child support; and that he will pay attorney's fees to Mother in the amount of $11,000. Father appealed both the July 29, 2014, and the October 18, 2013, orders to the circuit court, which affirmed by order entered October 22, 2014.

---

[10] In its order, the family court noted that it had some concerns regarding Father's "good faith and/or veracity after reviewing the allegations and statements made in his new Texas filings" including his allegations of domestic violence necessitating a batterer's intervention program or mental health treatment for Mother and a request that Mother be denied access to the child or otherwise be supervised. The family court emphasized that such allegations were not made during the September 17, 2013, hearing. Father also argued that his petition to modify should be granted because Mother's change in residence has caused him to incur increased costs to exercise his time with C.L. However, the family court pointed out that the residences of Mother and Father have not changed since entry of the May 16, 2013, agreed order entered in Virginia. Finally, the family court observed that the Texas court was not "properly informed of the status of this case in West Virginia. There was no mention of the West Virginia proceeding in the Texas [TRO]," in Father's petition for the same, or in the accompanying documents.

[11] As for default jurisdiction, the family court's order stated that "West Virginia can have jurisdiction if we go through all prior steps and neither West Virginia nor any other state would have jurisdiction. That is, no state can meet the requirements of the UCCJEA and accordingly West Virginia takes it by default."

[12] The family court's order noted that its attempts to include the Texas court in the discussion of jurisdiction were unsuccessful but that the "Texas judge was included as a matter of courtesy, even though they [sic] had previously declined jurisdiction of the custody determination and allowed the case to proceed in Virginia. Also, after our evidentiary hearing in West Virginia, [Father] filed a pleading in Texas seeking to modify the Virginia order in Texas."

5

Father now appeals the circuit court's orders entered October 22, 2014, and April 23, 2014.

This Court reviews the circuit courts orders under the following standard:

> "In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

Syl. Pt. 1, *Ware v. Ware*, 224 W.Va. 599, 687 S.E.2d 382, 384 (2009). Additionally,

> "[u]nder the clearly erroneous standard, if the findings of fact and the inferences drawn by a family master are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit court may be inclined to make different findings or draw contrary inferences." Syllabus Point 3, *Stephen L.H. v. Sherry L.H.,* 195 W.Va. 384, 386, 465 S.E.2d 841 (1995).

Syl. Pt. 2, *Rosen v. Rosen*, 222 W.Va. 402, 664 S.E.2d 743 (2008). It is with these standards of review in mind that we consider the parties' arguments.

In his first assignment of error, Father argues that the family court erred when it assumed jurisdiction of the custody proceedings pursuant to the agreed final order entered in Virginia, which purported to transfer the matter to West Virginia. Father contends that the family court should not have given full faith and credit to the Virginia order under the UCCJEA because Virginia lacked subject matter jurisdiction over the custody issue and because the evidence does not support the family court's finding that the Texas court declined jurisdiction in favor of Virginia. Father argues that, to the contrary, the Texas court wished to exercise jurisdiction as evidenced by various actions taken by that court after it purportedly agreed to decline jurisdiction, but before the family court entered its November 1, 2013, order regarding jurisdiction.[13]

We find Father's arguments to be without merit. Under the UCCJEA,

> [a] court of this State shall recognize and enforce a child custody determination of
> a court of another state if the latter court exercised jurisdiction in substantial

---

[13] Father also contends that the family court manipulated the facts of this case and the jurisdictional factors set forth in West Virginia Code 48-20-201, thereby revealing its bias in favor of finding jurisdiction in West Virginia. In that Father failed to raise this argument below, we decline to address it in this appeal. *See Whitlow v. Bd. of Educ. of Kanawha Cnty.*, 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993) (cautioning that "[o]ur general rule . . . is that, when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered on appeal.").

conformity with this chapter or the determination was made under factual circumstances meeting the jurisdictional standards of this article and the determination has not been modified in accordance with this article.

W.Va. Code § 48-20-303(a). Indeed, even before adoption of the UCCJEA, West Virginia applied the Full Faith and Credit Clause[14] to child custody issues, characterizing the doctrine as "a nationally unifying force to keep the various states from ignoring judicial decrees rendered outside their border," *Stewart v. Stewart,* 169 W.Va. 1, 4, 289 S.E.2d 652, 654 (1980) (citing *Sherrer v. Sherrer,* 334 U.S. 343, 355 (1948)), and one "designed to bring about an end to litigation, thereby giving finality to court proceedings." *Id.* (citing *Riley v. New York Trust Co.,* 315 U.S. 343, 348-49 (1942)). Also in *Stewart,* this Court cautioned:

> "[W]hile it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment, the modern decisions of this Court have carefully delineated the permissible scope of such an inquiry. From these decisions there emerges the general rule that a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment."

169 W.Va. at 5, 289 S.E.2d at 654 (citing *Durfee v. Duke,* 375 U.S. 106, 111 (1963)). *See Sheila L. on Behalf of Ronald M.M. v. Ronald P.M.,* 195 W.Va. 210, 216-17, 465 S.E.2d 210, 216-17 (1995).

The family court properly gave full faith and credit under the UCCJEA to the agreed order entered into by the parties in Virginia. Prior to entry of that order, the Texas and Virginia courts conferred and, as indicated by the March 1, 2013, letter between the two courts, it was resolved that Texas would not be exercising jurisdiction over the custody matter. Father's subsequent appeal as to the propriety of Virginia's jurisdiction was dismissed by the Circuit Court for Wise County by order entered March 27, 2013, and the matter was remanded to the juvenile and domestic relations court for further proceedings. Following remand, on April 10, 2013, Father moved that the Virginia court reconsider the jurisdiction issue.[15] Ultimately, under the May 16, 2013, Virginia order, the parties agreed to various terms involving custody and visitation of the child. Father now contends that he agreed to the order based upon his lawyer's representation that, due to Virginia's lack of subject matter jurisdiction, the order was not valid or enforceable.[16] Importantly, however, the agreed order failed to include any exceptions or objections by Father as to jurisdiction; moreover, Father failed to appeal the order on jurisdictional grounds or otherwise. Father has thus failed to show that the family court clearly

---

[14] *See* W.Va. Const. art. IV, § 1.

[15] It is unclear whether the court ruled on Father's motion.

[16] Father also states that he agreed to the order because, if he refused, his lawyer believed that the court would hold Father in contempt.

7

erred in its finding that the Virginia order is a valid court order entitled to full faith and credit, having failed to demonstrate that, as to Virginia's jurisdiction, the question was not "fully and fairly litigated and finally decided in" Virginia. *See Stewart*, 169 W.Va. at 5, 289 S.E.2d at 654. As for Father's contention that Texas did not decline jurisdiction of the matter based upon its actions following his filing of a petition to modify the parent-child relationship, the Court is of the belief that the Texas court acted because Father failed to advise it of the ongoing UCCJEA proceedings in West Virginia. Thus, this Court finds no error in the family court's conclusion that Virginia had jurisdiction in this case.

In a related assignment of error, Father argues that the family court erred in excluding evidence on the issues of jurisdiction and custody at the September 17, 2013, and June 24, 2104, hearings. Father argues that the family court refused to allow evidence relating to events that transpired prior to entry of the Virginia order as well as an affidavit he executed that purported to refute findings of facts made by the family court in its November 1, 2013, order. In particular, Father sought to introduce evidence that, in fact, the jurisdiction issue was not extensively litigated in the Virginia courts and evidence consisting of, inter alia, text messages and emails between Father, Mother, and Father's grandmother, that showed that Father took C.L. to Texas with Mother's consent following the December 2012 meeting at the Barboursville hotel. Father also argues that the family court failed to properly consider the Texas police report relating to its investigation of Mother's allegations that Father absconded with C.L. from the Barboursville hotel without her consent, as that report, in effect, exonerated him from wrongdoing, and also proceeded to ignore the fact that there were pending charges against Mother for filing charges against Father in connection with this incident. He contends that the family court erroneously disregarded evidence that he cared for the child in Texas for over four months in its determination that Texas did not have jurisdiction based upon its finding that Father "absconded with the child, fleeing during the night from what was intended to be a visitation in [the hotel] in West Virginia."

Upon our review of the family court's November 1, 2013, order, it is clear that the court considered the evidence of the Texas investigation, as the order makes numerous findings with regard thereto and, furthermore, notes that Mother was charged in West Virginia with the misdemeanor of false reporting of an emergency incident in connection therewith. Furthermore, the family court heard extensive testimony about the circumstances surrounding Father's taking of C.L. from the hotel and the child's four-month long stay with Father in Texas and made findings based thereon. Consistent with the deference given to a family court sitting as a trier of fact with regard to its findings of fact, this Court has stated that "[a]n appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact. It is for the [trier of fact] to decide which witnesses to believe or disbelieve. Once the [trier of fact] has spoken, this Court may not review the credibility of the witnesses." *State v. Guthrie*, 194 W.Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995).

As for the evidence that Father argues was improperly excluded by the family court, we have long held that such rulings "'are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings . . . under an abuse of discretion standard.' *Reynolds v. City Hosp., Inc.,* 207 W.Va. 101, 108-9, 529 S.E.2d 341, 348-9 (2000)." *Wells v. Key Commc'ns, L.L.C.,* 226 W.Va. 547, 551, 703 S.E.2d 518, 522 (2010). Upon our review, we find that the family court did not abuse its discretion in excluding evidence Father

argues would have shown that the jurisdiction issue was not extensively litigated in Virginia and evidence tending to show that Mother consented to Father's taking of C.L. to Texas. Indeed, upon our review of the record in this case, it is clear that it was Father's intention to present such evidence in order to re-litigate issues previously considered and resolved by the family court.

In his next assignment of error, Father argues that the family court erred by failing to timely hold a hearing on the emergency ex parte petition following entry of the emergency ex parte order on October 18, 2013. We find Father's argument to be without merit, as the delay in the hearing was primarily caused by Father's requests to continue the hearing occasioned by efforts to obtain new counsel following the September 17, 2013, hearing. A hearing on the ex parte petition that was scheduled for December 19, 2013, was continued by Father's counsel. A second hearing scheduled for January 30, 2014, was continued by a different attorney for Father who, it was later determined, would not be representing Father after all. On appeal, Father fails to allege that, once his representation issues were finally resolved, that he requested an expedited hearing. To the contrary, at the June 24, 2014, hearing, in referencing the final order on the jurisdictional merits, Father's counsel admitted that, with regard to the emergency ex parte petition, "we couldn't really come back in and submit to jurisdiction when we're appealing jurisdiction."

This Court has previously held that "'[a] litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal.' Syllabus Point 1, *Maples v. West Virginia Dep't of Commerce,* 197 W.Va. 318, 475 S.E.2d 410 (1996)." Syl. Pt. 2, *Hopkins v. DC Chapman Ventures, Inc.*, 228 W.Va. 213, 719 S.E.2d 381 (2011). *See* Syl. Pt. 2, *In re Aaron Thomas M.*, 212 W.Va. 604, 575 S.E.2d 214 (2002) (holding that "'[a] judgment will not be reversed for any error in the record introduced by or invited by the party seeking reversal.' Syllabus point 21, *State v. Riley,* 151 W.Va. 364, 151 S.E.2d 308 (1966)."). Father does not dispute that his counsel requested that the scheduled hearings be continued. He thereafter never sought an expedited hearing or, as the June 24, 2014, hearing transcript reveals, never raised the issue of timeliness before the family court. Thus, we conclude that any error that may have occurred with respect to the timeliness of the hearing—if it was error—was invited and, therefore, waived.[17]

In his next assignment of error, Father argues that, without just cause, the family court's July 30, 2014, order, found that the court "is concerned that there is still an outstanding Court action in Texas which includes in its file an Order for Custody of the child in that state[;]" and ordered that it "will allow [Father] NO contact with the child while the outstanding action in Texas continues since he is a flight risk with the child." Father argues that, although this Court has not addressed the propriety of a family court's order that attempts to coerce a parent's compliance by preventing visitation, other courts have found that a court "lacks authority to impose conditions precedent to the resumption of a parent's contact and visitation with a child." *Bray v. Destevens*, 911 N.Y.S.2d 556, 557 (N.Y. App. Div. 2010). Father further argues that another court denied a mother's request that father receive supervised visitation where there was

---

[17] Father also contends that the family court entered the emergency order prior to entry of its order concluding that it had jurisdiction of the subject matter under the UCCJEA. Given that the family court ultimately determined that it had jurisdiction, any error in entering the emergency order was harmless.

evidence that he was likely to abduct their children and flee the country because the evidence of the risk of abductions was insufficient. *See In re Marriage of Jawad & Whalen*, 759 N.E.2d 1002 (Ill. App. Ct. 2001). In this case, Father contends that the family court failed to require Mother to present evidence justifying any restriction on his visitation with C.L., nor did it require evidence that, if a risk existed, that it could not be minimized by less restrictive means. We find no error.

During the June 24, 2014, hearing, the family court noted that Father's conduct of filing a petition to modify the parent-child relationship in Texas during the pendency of the UCCJEA proceedings in West Virginia "makes me not trust him as far as I can see him letting the child out of sight or around him." The family court made previous findings that Father made false representations to the Texas court that resulted in an order that could be used to forcibly remove C.L. from the jurisdiction of West Virginia; that Father denied that his Texas filings were intended to seek custody of C.L., despite their clear language to the contrary; and that Father took C.L. from a Barboursville hotel to Texas without Mother's consent. The family court's findings, and the inferences drawn therefrom, are supported by substantial evidence and were not clearly wrong. *See* Syl. Pt. *Rosen*. We find no abuse of discretion in the family court's order that prohibits Father's contact with C.L. until the Texas proceedings are resolved because Father is a flight risk with the child.

In his final assignment of error, Father argues that the family court erred in awarding Mother $11,000 in attorney fees. In its July 29, 2014, order, the family court found that Father "had the financial means based upon his financial disclosure and the disparity of income between the parties, to pay [Mother] $11,000.00 in attorney fees . . . . The Court finds that [Mother] substantially prevailed in this case and [Father] by his conduct, complicated the litigation and proceedings in this case." Father argues that, to the contrary, the evidence demonstrated that he was unemployed and was only making $16,000 per year, which was the amount the family court accepted for calculation of child support.[18]

This Court has previously held that

> an award of attorney's fees rests initially within the sound discretion of the family law master and should not be disturbed on appeal absent an abuse of discretion. In determining whether to award attorney's fees, the family law master should consider a wide array of factors including the party's ability to pay his or her own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, the effect of the attorney's fees on each party's standard of living, the degree of fault of either party making the divorce action necessary, and the reasonableness of the attorney's fee request." Syl. Pt. 4, *Banker v. Banker,* 196 W.Va. 535, 474 S.E.2d 465 (1996).

Syl. Pt. 2, in part, *Paugh v. Linger*, 228 W.Va. 194, 718 S.E.2d 793 (2011). Father contends that, in an attempt to obtain a relationship with his child, he has complied with every court order; never failed to return the child; exercised his custody under the Virginia agreed order; and has supported the child. He further contends that the family court has punished him for exercising his

---

[18] During the June 24, 2014, it was noted that, in 2012, Father made $88,000 and, in 2013, more than $50,000.

right to maintain an action in Texas and that it was, in fact, Mother, who complicated the litigation by initiating proceedings in Virginia.

We find Father's argument to be without merit. West Virginia Code 48-1-305 (b) and (c) provide as follows:

> (b) The court may compel either party to pay attorney's fees and court costs reasonably necessary to enable the other party to prosecute or defend the action. An order for temporary relief awarding attorney's fees and court costs may be modified at any time during the pendency of the action, as the exigencies of the case or equity and justice may require, including, but not limited to, a modification which would require full or partial repayment of fees and costs by a party to the action to whom or on whose behalf payment of such fees and costs was previously ordered. If an appeal is taken or an intention to appeal is stated, the court may further order either party to pay attorney's fees and costs on appeal.

> (c) When it appears to the court that a party has incurred attorney fees and costs unnecessarily because the opposing party has asserted unfounded claims or defenses for vexatious, wanton or oppressive purposes, thereby delaying or diverting attention from valid claims or defenses asserted in good faith, the court may order the offending party, or his or her attorney, or both, to pay reasonable attorney fees and costs to the other party.

During the June 24, 2014, hearing, the family court found that the West Virginia proceedings were "made much more involved because of [Father's] challenge to the jurisdiction originally that he agreed to in Virginia that brought the case here. That's why we had to have this full hearing[,]" and that Mother "had to incur those fees to defend that order from Virginia that they agreed and entered into [t]here. And then, there was the appeal. And so, they had to defend that. And he lost on both of those issues."[19] Given these facts, the family court acted within its discretion to award Mother attorney fees pursuant to West Virginia Code §48-1-305, as Mother was forced to incur attorney fees unnecessarily due to Father's assertion of unfounded claims.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** November 6, 2015

**CONCURRED IN BY:**
Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum

---

[19] The family court made clear that the award of attorney fees are for those fees incurred in connection with proceedings occurring in West Virginia only.

**DISSENTING:**

Justice Brent D. Benjamin

**NOT PARTICIPATING:**

Justice Allen H. Loughry II